**Jean MITCHELL, Etc.,
Plaintiff, Appellee,**

v.

**UNITED STATES of America,
Defendant, Appellant.**

**Jean MITCHELL, etc., et al.,
Plaintiffs, Appellants,**

v.

**UNITED STATES of America,
Defendant, Appellee.**

**Nos. 96–2216, 97–1442, 96–2217.**

United States Court of Appeals,
First Circuit.

Heard Oct. 8, 1997.

Decided March 25, 1998.

---

Mary Elizabeth Carmody, Assistant United States Attorney, Senior Litigation Counsel, Boston, MA, with whom Donald K. Stern, United States Attorney, Boston, MA, was on brief, for appellant United States.

Celine M. Boyle, with whom Robert M. Higgins, Elizabeth N. Mulvey and Lubin & Meyer, P.C., Boston, MA, were on brief, for appellee Jean Mitchell.

Before TORRUELLA, Chief Judge, LYNCH, Circuit Judge, and STEARNS,* District Judge.

TORRUELLA, Chief Judge.

Alfred J. Hassey died on June 3, 1990, from a stroke he had suffered soon after undergoing a colonoscopy at the West Roxbury Veterans Administration Hospital. His daughter, Jean Mitchell, as Administratrix of his estate, filed this wrongful death action on behalf of her mother, siblings, and herself against his treating physicians, Drs. Carl Berg and Marc Silver, as well as against the United States of America, the owner of the Hospital. After dismissing the claims against the individual defendants and holding a bench trial on the remaining claims, the trial judge found the United States liable and awarded damages to the decedent's widow, but not to his children. Both the United States and the Administratrix, on behalf of the decedent's children, cross-appealed. We affirm, with one minor clarification.

## BACKGROUND [1]

Mr. Hassey had been diagnosed in 1985 with atrial fibrillation, a heart condition that often causes an increase in the rate at which blood clots are formed. His doctors therefore prescribed the use of Coumadin, an anticoagulant medication, in order to help prevent the formation of blood clots. Mr. Hassey had also suffered from colon

---

* Of the District of Massachusetts, sitting by designation.

1. We set out the facts in the light most favorable to the trial court's findings of fact. *See Wain-* *wright Bank & Trust Co. v. Boulos,* 89 F.3d 17, 18 (1st Cir.1996).

cancer, which was treated by a hemicolonectomy in 1983. The operation was successful and he remained asymptomatic until the end of his life. Nevertheless, he was required to undergo prophylactic colonoscopies approximately every two years to detect any recurrence of the cancer. In June of 1988, Mr. Hassey underwent a colonoscopy at the Hospital. He was taken off Coumadin three days prior to the operation, and instead given Heparin, another anticoagulant. Coumadin therapy was restarted the same day he was discharged from the Hospital. He reported no ill effects from this operation.

Two years later, Mr. Hassey was due for another colonoscopy. Without reviewing his medical chart or medical history, Mr. Hassey's physicians, Drs. Carl Berg and Jacques Van Dam, instructed him to discontinue his Coumadin therapy starting five days prior to his colonoscopy. Mr. Hassey stopped taking Coumadin six days before the procedure, on April 17, 1990. He was admitted to the Hospital on April 22, 1990, and on the following day, Drs. Berg and Van Dam performed the colonoscopy. During the operation, a suspicious polyp was located and removed by "hot" biopsy, pursuant to which the surgeons cauterized the intestinal wall from which the polyp had been removed. The polyp was later determined to be pre-cancerous. Mr. Hassey was discharged on that same day by Hospital physician Dr. Marc Silver, and instructed to restart the Coumadin therapy after five days.

As scheduled, Mr. Hassey restarted the Coumadin therapy on April 28, 1990, eleven days after he had stopped taking the medication. That was the longest period of time that he had been off Coumadin since he was first prescribed its use. The following day, Mr. Hassey was re-admitted to the Hospital because he was experiencing weakness in the right side of his body and had difficulty speaking. He suffered a massive cerebral vascular accident: in lay terms, a stroke. One month later, Mr. Hassey died from complications arising from the stroke.

In her role as Administratrix of the Estate of Alfred J. Hassey, Jean Mitchell filed the instant suit against Drs. Berg and Silver, as well as against the United States of America,

the owner of the Hospital. The complaint, which alleged that the defendants' negligence was the proximate cause of Mr. Hassey's death, was brought under the Federal Tort Claims Act, 28 U.S.C. §§ 2671–80, and the Massachusetts wrongful death statute, Mass. Gen. Laws ch. 229, §§ 1–2. The complaint specifically alleged that the defendants violated their duty of care to the decedent by keeping him off Coumadin for an excessive period of time. The complaint further alleged that the discontinuation of the Coumadin therapy was the proximate cause of the stroke that ultimately led to Mr. Hassey's death. Before trial, the Administratrix and the United States stipulated that the United States would be substituted, in place of Drs. Silver and Berg, as the sole party defendant. See 28 U.S.C. § 2679(d)(1).

During the bench trial, four expert witnesses testified as to the nature and causes of Mr. Hassey's death, two on behalf of the Administratrix, and two on behalf of the United States. Mr. Hassey's relatives also testified as to the emotional impact that his death had upon them. After the trial, the district judge found that the United States was liable to Evelyn Hassey in that its employees "failed to use the care and skill of an average qualified specialist taking into account the advances in their profession in their care and treatment of Alfred Hassey." The district judge awarded Mrs. Evelyn Hassey $300,000 for her loss, but awarded nothing to the Administratrix or to the decedent's children. Various post-judgment motions were submitted to and rejected by the district court. Both the United States and the Administratrix now appeal from the judgment of the district court.

### STANDARD OF REVIEW

Pursuant to Fed.R.Civ.P. 52, "[i]n all actions tried upon the facts without a jury," the trial court's "[f]indings of fact, whether based on oral or documentary evidence, shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge the credibility of the witnesses." See Sullivan v. Young Bros. & Co., Inc., 91 F.3d 242, 246–47 (1st Cir.1996); Irving v. United States, 49

F.3d 830, 835 (1st Cir.1995); *Cumpiano v. Banco Santander Puerto Rico,* 902 F.2d 148, 152 (1st Cir.1990). Similarly, review of decisions to admit expert testimony is for abuse of discretion. *See General Elec. Co. v. Joiner,* —— U.S. ——, 118 S.Ct. 512, 139 L.Ed.2d 508 (1997). On the other hand, the trial court's conclusions of law are reviewed *de novo. See Damon v. Sun Company, Inc.,* 87 F.3d 1467, 1471 (1st Cir.1996).

### *APPLICABLE LAW*

■ The district court's jurisdiction over this complaint was premised on 28 U.S.C. § 1346(b)(1), which provides that:

> the district courts ... shall have exclusive jurisdiction of civil actions on claims against the United States, for money damages, ... for personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred.

Thus, with some exceptions not relevant to this case, the standard of liability applicable to a suit under the Federal Tort Claims Act is provided by the law of the state in which the tort occurred. *See* 28 U.S.C. §§ 1346(b)(1) and 2674.

Because the tort occurred in Massachusetts, that state's law applies. The Administratrix brought suit under the Massachusetts wrongful death statute, Mass. Gen. Laws ch. 229, § 2, which provides that "[a] person who by his negligence causes the death of a person ... shall be liable in damages," and also that "[a] person shall be liable for the negligence or the willful, wanton or reckless act of his agents or servants while engaged in his business to the same extent and subject to the same limits as he would be liable under this section for his own act." In wrongful death actions based on death because of negligence, the substantive standard of liability is provided by the Massachusetts common law of torts, which we discuss below.

### *ANALYSIS*

Both the plaintiff and the defendant have appealed from the judgment below. The finding of liability is challenged only by the defendant, while both plaintiff and defendant seek review of the award of damages. We first address the appeal from the finding of liability.

### I. Liability for Medical Malpractice

#### A. Application of the standard of liability

■ The negligence alleged in this case is medical malpractice. Under Massachusetts tort law, a plaintiff in a medical malpractice suit bears the burden of proving by a preponderance of the evidence that a physician-patient relationship existed between the physician and the injured party, that the physician breached his or her duty of care, and that the breach was the proximate cause of the injury. *See Blood v. Lea,* 403 Mass. 430, 530 N.E.2d 344, 347 (1988); *see also Poyser v. United States,* 602 F.Supp. 436, 438 (D.Mass.1984); *Berardi v. Menicks,* 340 Mass. 396, 164 N.E.2d 544, 546 (1960). Generally, a plaintiff in a medical malpractice action may carry his or her burden of proof on the issues of negligence and causation only with the assistance of expert testimony. *See Harlow v. Chin,* 405 Mass. 697, 545 N.E.2d 602, 605 (Mass.1989) (expert testimony generally required to prove causation); *Forlano v. Hughes,* 393 Mass. 502, 471 N.E.2d 1315, 1319 (1984) (expert medical opinion generally required to prove breach of duty of care). A physician is held to the standard of care and skill of the average practitioner of the medical specialty in question, taking into account the advances in the profession. *See Poyser,* 602 F.Supp. at 438–39 (citing *Brune v. Belinkoff,* 354 Mass. 102, 235 N.E.2d 793, 798 (1968)). Proof of the element of causation, which is an issue of fact, depends on whether it is more probable than not that the death was the result of the physician's negligence. *See Harlow,* 545 N.E.2d at 605. Here it must be emphasized that:

> [w]hile the plaintiff is not bound to exclude every other possibility of cause for his injury except that of the negligence of the

defendant, he is required to show by evidence a greater likelihood that it came from an act of negligence for which the defendant is responsible than from a cause for which the defendant is not liable.

*Forlano,* 471 N.E.2d at 1319 (citations omitted).

The defendant argues that the district court erred as a matter of law by evaluating its actions under a strict liability rather than negligence standard of care. The United States points to certain isolated statements made by the trial judge during trial that, it claims, establish that he applied a strict liability standard of care. We disagree. The comments in question were vague and do not necessarily establish that the judge applied the wrong standard of care. Indeed, in his findings of fact and conclusions of law, the trial judge relied on expert medical opinion in determining that Mr. Hassey's treating physicians provided negligent medical care, and that their negligence was a proximate cause of his death.

### B. Admission of statistical evidence

The United States complains that the district court erred in refusing to admit or consider the testimony of one of its medical experts on the statistics concerning the risk of stroke versus the risk of bleeding. We reject this assignment of error. The trial judge ultimately did not refuse to admit this testimony. Although he did, at first, resist the admission of the statistical evidence, on the following day the trial judge proceeded to hear the testimony in question. The defendant's invitation to reverse the judgment below is thus based on its speculative conclusion that the absence of a discussion of statistical evidence in the judge's findings of fact "clearly indicate[s]" that he did not consider this evidence because he was biased against its use. We decline the invitation to engage in such speculation.

### C. Admission of expert testimony

The United States also claims that the judgment below must be reversed insofar as it rested on the plaintiff's expert testimony, which it contends should have been excluded by the district court under *Daubert v.*

*Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). We reject this argument, too. The baseline for approaching questions of the admissibility of evidence is Fed.R.Evid. 402, which provides that "[a]ll relevant evidence is admissible," except as otherwise provided by the Constitution, laws, or rules of the court. Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Fed. R.Evid. 401. As the Supreme Court noted, "the Rule's basic standard of relevance thus is a liberal one." *Daubert,* 509 U.S. at 587, 113 S.Ct. at 2793–94.

With regard to expert testimony, the rules of evidence specifically provide:

If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

Fed.R.Evid. 702. In *Daubert,* which interpreted Rule 702, the Supreme Court held that when a trial judge is faced with the decision to accept or reject a proffer of expert scientific testimony, the judge must determine:

whether the expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact to understand or determine a fact in issue. This entails a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning and methodology properly can be applied to the facts in issue.

*Daubert,* 509 U.S. at 592–93, 113 S.Ct. at 2796; *see also Vadala v. Teledyne Indus., Inc.,* 44 F.3d 36, 39 (1st Cir.1995). Of course, there is a third, implicit consideration: "[t]he trial court first must determine whether the putative expert is qualified by knowledge, skill, experience, training, or education." *See Ed Peters Jewelry Co., Inc. v. C & J Jewelry Co., Inc.,* 124 F.3d 252, 259 (1st Cir.1997)

(quoting *Bogosian v. Mercedes–Benz of N. Am., Inc.*, 104 F.3d 472, 476 (1st Cir.1997)); *cf. Rohde v. Lawrence General Hosp.*, 34 Mass.App.Ct. 584, 614 N.E.2d 686, 688 (1993). Finally, we note that a district court enjoys substantial discretion to decide whether to admit or exclude relevant expert testimony. *See General Elec. Co.*, —— U.S. ——, 118 S.Ct. 512; *Bogosian*, 104 F.3d at 479.

There is no dispute over the professional qualifications of the plaintiff's expert witnesses, Drs. Barry Singer and Howard Adler. The first issue is thus whether the testimony offered by the plaintiff's expert witnesses was relevant—i.e., whether the testimony could "assist the trier of fact to understand or determine a fact in issue." *Daubert*, 509 U.S. at 592, 113 S.Ct. at 2796. The issue before the judge was whether Mr. Hassey's treating physicians acted according to the standard of care and skill of the average member of a practitioner of their medical specialty, taking into account the advances in the profession, when they adjusted Mr. Hassey's anticoagulant levels before and after the colonoscopy.

The experts for both parties testified that during a colonoscopy, if a polyp is detected, the surgeon normally performs a polypectomy (a type of biopsy), cutting off the polyp for examination. The experts also agreed that anticoagulants can increase the risk of bleeding from wounds and retard their healing. Thus, to allow the clotting factors of a colonoscopy patient on Coumadin therapy to return to normal so as to permit adequate healing of his or her intestinal tissue, such a patient is required to be off Coumadin for a period of time. The longer the period during which the patient is not taking Coumadin, however, the greater the risk that he or she will suffer a stroke. The proper length of time to keep a colonoscopy patient off Coumadin therefore depends on a balancing between the risk of bleeding and the risk of stroke.

The testimony offered by Drs. Singer and Adler was certainly relevant to the issue at trial. Dr. Singer, an internist with specialties in hematology and oncology, testified that he had substantial experience in the use of Coumadin, and that he had performed several colonoscopies earlier in his career. He also testified that he had been consulted over 100 times by gastroenterologists seeking advice on the proper treatment for patients on anticoagulant medication who were scheduled to undergo colonoscopies. Similarly, Dr. Adler, an internist with a specialty in gastroenterology, testified that he has performed at least twenty thousand colonoscopies, as well as numerous biopsies, including polypectomies. He further testified that he was familiar with the risk of bleeding associated with these procedures, and with the standard of care expected of gastroenterologists in adjusting anticoagulant levels for patients undergoing colonoscopies. We find no error in the district judge's determination that the testimony provided by both of these experts would assist him in understanding and determining the facts at issue in this case.

■ Nevertheless, the United States challenges the admissibility of the opinions of these experts on the basis that such testimony was not reliable. With regard to Dr. Singer, the defendant claims that he was not qualified to testify about the defendants' treatment of Mr. Hassey because he is not a specialist in gastroenterology, and that he could not provide a reliable opinion on the risk of stroke as compared to the risk of bleed because he admitted during trial that he had no direct knowledge of the risk of bleeding from a colonoscopy during which a polypectomy was performed.

■ We disagree. First of all, the Government is simply wrong to suggest that Dr. Singer was not qualified to testify merely because he was not a gastroenterologist. "The fact that the physician is not a specialist in the field in which he is giving his opinion affects not the admissibility of his opinion but the weight the jury may place on it." *Payton v. Abbott Labs*, 780 F.2d 147, 155 (1st Cir.1985); *cf. Letch v. Daniels*, 401 Mass. 65, 514 N.E.2d 675, 677 (1987) ("A medical expert need not be a specialist in the area concerned nor be practicing in the same field as the defendant.")

Moreover, the specific testimony offered by Dr. Singer was within his area of exper-

tise. He testified that cardiologists and hematologists are very much aware of the relative benefits and risks arising from the use of anticoagulants such as Coumadin, and the effects of their discontinuation. Dr. Singer explained that when a patient who has been taking Coumadin for several years is taken off the medication, that patient will enter a hypercoagulative state in which the rate at which clots are produced is greatly increased. Dr. Singer also testified that Coumadin takes about three days after it is restarted to have any effect on clot formation. Furthermore, Dr. Singer noted that he was familiar with the standard of care for gastroenterologists because he had been consulted by gastroenterologists on more than 100 occasions on the appropriate treatment for colonoscopy patients who are on anticoagulant therapy.

The United States makes much of the fact that Dr. Singer admitted that he did not know how the risk of bleeding would vary depending on whether a hot or cold biopsy had been performed. As other witnesses explained, biopsies can be "cold" or "hot," the main difference being that during hot biopsies, the flesh is cauterized afterwards to minimize bleeding immediately after the operation. Patients undergoing hot biopsies, however, are at risk for delayed bleeding between seven and fourteen days after the operation, when the scab that formed over the cauterized tissue falls away. The defendant argues that Dr. Singer's admission establishes that his opinion—that the risk of bleeding was less than the risk of stroke— was personal speculation unsupported by any knowledge, training or experience and thus lacked a reliable factual foundation.

The inference is unwarranted. A review of the trial transcript indicates that Dr. Singer merely stated that he could not quantify the risk of bleeding from a biopsy. In the context of the question, "risk" referred to the likelihood of bleeding, not its severity. Dr. Singer also testified, however, that he knew that the risk of bleeding was generally lower than the risk of stroke in terms of severity because only a tiny fraction of patients undergoing biopsies die as a result of these procedures. In his opinion, the danger posed by keeping a patient off Coumadin for 11 days, with the attendant increase in the rate of clot production, is a greatly increased risk that the patient will suffer a stroke, which often leads to brain damage and death. It was not necessary for Dr. Singer to be able to specify in numerical terms the likelihood that a biopsy patient would bleed after an operation in order to support his opinion that the risk that a patient would suffer a stroke clearly exceeded the danger posed by the possibility of post-operative bleeding, and thus that anticoagulants should be restarted sooner than the defendants did with Mr. Hassey.

■ The United States also objects to Dr. Adler's testimony, which it also claims was unreliable and therefore should have been excluded under *Daubert.* Dr. Adler testified that he would have restarted anticoagulant therapy several days before Mr. Hassey's physicians did. The defendant's main complaint is that Dr. Adler rendered his opinion without first reading the transcripts of the physicians' depositions or certain parts of the medical record, including the post-operative report prepared by Dr. Berg. This complaint would be valid only if the parts of the record that Dr. Adler did not read contained information that was unavailable in the parts that he did read. In fact, Dr. Adler's evaluation of the pathologist's report allowed him to study the nature of the incisions made by the defendants in the course of the biopsy. This report is at least as reliable a basis for his opinion as the report prepared by the treating physicians.

■ The defendant also argues that there was a discrepancy between the treatment that Drs. Adler and Singer would have recommended for Mr. Hassey. We fail to see how this discrepancy should render Dr. Adler's testimony inadmissible.[2] To the con-

---

**2.** While the parties properly frame the discussion of the expert testimony offered at trial under the rubric of *Daubert,* we note that the testimony did not involve the admissibility of evidence based on novel scientific hypothesis or methodology. *See Moore v. Ashland Chemical, Inc.,* 126 F.3d 679, 688–90 (5th Cir.1997); *see also Commonwealth v. Gordon,* 422 Mass. 816, 666 N.E.2d 122, 138–39 (1996). We note that the Supreme Judicial Court has adopted *Daubert* "in concept," but

trary, although couched in *Daubert* terms, this argument is a thinly veiled challenge to the district court's determination of the credibility and soundness of Dr. Adler's opinion. "The fact that defendant was able to undercut some of the research basis for the doctors' opinions does not affect the admissibility of those opinions. If the factual underpinnings of their opinions were in fact weak, that was a matter affecting the weight and credibility of their testimony." *Payton*, 780 F.2d at 156 (citing *Coleman v. DeMinico*, 730 F.2d 42, 47 (1st Cir.1984)); *cf. Baker v. Commercial Union Ins. Co.*, 382 Mass. 347, 416 N.E.2d 187, 190 (1981) ("The question whether the basis of the doctor's opinion is sound goes to the weight of the evidence, not its admissibility.") The finder of fact's determinations of credibility, and of the weight of the evidence in general, are not disturbed on appeal except for clear error. A finding of fact is clearly erroneous when the reviewing court is left with the definite and firm conviction that a mistake has been made. *See Anderson v. City of Bessemer City*, 470 U.S. 564, 573, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518 (1985). Thus, a credibility determination is clearly erroneous only when it is based on testimony that was inherently implausible, internally inconsistent, or critically impeached. *See Keller v. United States*, 38 F.3d 16, 25 (1st Cir.1994).

Dr. Adler's testimony was admissible and the court was entitled to rely on it: it was plainly plausible, internally consistent (it was partly inconsistent with Dr. Singer's testimony, not with his own), and was not critically impeached. More generally, the parties presented conflicting expert testimony from medical specialists on the issue of whether the defendants' decision to keep Mr. Hassey off Coumadin for more than ten days was a breach of the applicable standard of medical care and the proximate cause of his death. After reviewing the record below, including the transcripts of the trial, we find the evidence before the district judge to be suffi-

cient to permit him to find that Drs. Berg, Van Dam, and Silver were negligent in their treatment of Mr. Hassey, and that their negligence was a proximate cause of his death.

**D. Denial of the Motion for New Trial**

The United States argues that a new trial was required because the plaintiff failed to provide any credible evidence that the risk of stroke was greater than the risk of bleeding, or that Mr. Hassey would not have had a stroke had the Coumadin therapy been restarted earlier. We disagree, for reasons already amply explored above.

**E. Denial of the Motion for Mistrial**

▮ Plaintiff's counsel filed a motion requesting certain conclusions of law, including a suggested award of damages. The United States argues that since the claim was for pain, suffering, and related subjective damages, the suggestion was a direct violation of Massachusetts law, which allegedly prohibits counsel from requesting that a finder of fact enter a specific subjective amount for unliquidated damage claims.

The request for mistrial was properly denied. First, a claim under section 2 of the wrongful death statute includes compensation not only for unliquidated damage claims, but also for liquidated damage claims, such as loss of income, which are not subject to the alleged prohibition.[3] Furthermore, the "prohibition" on suggestions as to the amount of awards for unliquidated damage claims is not a true prohibition, but rather only a strong recommendation. *See, e.g., Goldstein v. Gontarz*, 364 Mass. 800, 309 N.E.2d 196, 207 n. 15 (1974) ("We agree with recent suggestions that in *most* cases where the damages are unliquidated *and rest with the jury*, the trial judge would be better advised to withhold the ad damnum from the jury than to read the figure and then attempt to negate its effect with an instruction.") (emphasis added). Moreover, a review of the

---

unlike a federal court, it reviews *de novo* a trial court's ruling on the admissibility of scientific expert testimony. *See Commonwealth v. Vao Sok*, 425 Mass. 787, 683 N.E.2d 671, 677 (1997).

3. A claim under section 2 includes but is "not limited to compensation for the loss of the reasonably expected net income, services, protection, care, assistance, society, companionship, comfort, guidance, counsel, and advice of the decedent." Mass. Gen. Laws ch. 229, § 2.

relevant case law indicates this rule has only been applied to jury trials. In addition to the lack of precedent, we see no reason why Massachusetts would choose to extend the rule to bench trials, particularly since judges, unlike juries, are expected to be able to avoid being unduly influenced by counsel. Here, not only was the trial a bench trial, but it was the trial judge himself who requested an estimate of the amount of damages that should be awarded.

### F. Denial of the Motion for Reconsideration

■ In September of 1996, an article was published in the Journal of Gastrointestinal Endoscopy which contained the results of a nationwide survey of gastroenterologists to determine the average standard of practice with respect to the management of antiplatelet agents and anticoagulants, including Coumadin, when performing diagnostic and therapeutic endoscopic procedures, including colonoscopies. *See* C.E. Angueira, et al., *Gastrointestinal Endoscopy in Patients Taking Antiplatelet Agents and Anticoagulants: Survey of ASGE Members*, 44 J. of Gastrointestinal Endoscopy, No. 3, at 309 (1996). The following month, the Government filed a motion under Fed.R.Civ.P. 60(b)(2) for relief from judgment, claiming that the article constituted "new evidence" that directly contradicted the district court's findings of fact and conclusions of law. The district court denied the motion, and the United States now argues that the denial was an abuse of discretion.

■ A motion under Rule 60(b)(2) for "new trial on the ground of newly discovered evidence requires proof of the following elements:"

(1) The evidence has been discovered since the trial;

(2) The evidence could not by due diligence have been discovered earlier by the movant[;]

(3) The evidence is not merely cumulative or impeaching; and

(4) The evidence is of such nature that it would probably change the result if a new trial is granted.

*Raymond v. Raymond Corp.*, 938 F.2d 1518, 1527 (1st Cir.1991) (quoting *Nickerson v. G.D. Searle & Co.*, 900 F.2d 412, 417 (1st Cir.1990)). A district court's ruling on a motion under Rule 60(b) will only be overturned for an abuse of discretion. *See Raymond*, 938 F.2d at 1527; *Nickerson*, 900 F.2d at 416; *Duffy v. Clippinger*, 857 F.2d 877, 879 (1st Cir.1988).

There are two problems with the defendant's argument. The first is that it is by no means clear that this article constitutes "newly discovered evidence" for purposes of Fed.R.Civ.P. 60(b). Although the trial was held on May 1–3, 1996, approximately four months before the article was published, an abstract of the article had been available since 1993. A more diligent effort to research the relevant medical literature by the defendant should have produced the abstract.

The second and more important problem is that the evidence would not be likely to change the result of the trial. The United States has retained as experts some of the authors of the article, one of whom would testify that, based on the survey, he thought that 60% of the gastroenterologists in the United States would have restarted Coumadin after a colonoscopy within 7 days or less. The proposed expert would also testify that there are no published guidelines at present that would assist endoscopists in managing patients on anticoagulant therapy during the period of time following a colonoscopy, and that most endoscopists are therefore using their own judgment or criteria in managing such patients.

This evidence would not have required the trial judge to reach a different result. As a general matter, the article, and the expert's testimony, are based on a survey to which only 38.5% of ASGE members responded, a response rate which was described by the authors of the article as "less than ideal." Moreover, the responses were based on generalized questions, such as the length of time the gastroenterologists would wait before restarting Coumadin after a therapeutic colonoscopy (i.e., one during which a biopsy or polypectomy was performed) in patients suffering from conditions such as atrial fibrillation. The answers to these questions are not

definitive because they did not take into consideration the particulars of a patient's medical history, even though the experts testifying before the trial judge agreed that such particulars are indispensable in determining the proper treatment to be followed. As for the proposed testimony regarding the lack of published guidelines, the fact remains that gastroenterologists cannot close their eyes to the standard of care appropriate to other specialties when performing procedures within their own that impact upon other specialties.

The trial judge heard testimony from specialists in hematology and gastroenterology who indicated that Mr. Hassey should not have been kept off Coumadin as long as he was, and explained in detail why they thought so. We think it improbable that the proposed evidence would have resulted in a different outcome.

## II. Distribution of the Damages

 Both the Administratrix and the Government appeal from the district court's award of damages. The Administratrix argues that the district court erred as a matter of both law and fact in denying Mr. Hassey's adult children's claims for compensation under the Massachusetts wrongful death statute. The United States, in turn, argues that the district court did not err in not awarding damages to the decedent's children because they are adults who were no longer financially dependent upon their father and are therefore not entitled to recover under the statute. The Government also argues, however, that insofar as the district court awarded damages to Mr. Hassey's widow, rather than to the Administratrix, the district court acted without subject matter jurisdiction.

Section 2 of the wrongful death statute provides, in pertinent part, that:

[a] person who ... by his negligence causes the death of a person ... shall be liable in damages in the amount of ... the fair monetary value of the decedent to the persons entitled to receive the damages recovered, as provided in section [1], including but not limited to compensation for the loss of the reasonably expected net income, services, protection, care, assistance, society, companionship, comfort, guidance, counsel, and advice of the decedent to the persons entitled to the damages recovered.

Mass. Gen. Laws ch. 229, § 2. Section 2 further provides that "[a] person shall be liable for the negligence ... of his agents or servants while engaged in his business to the same extent and subject to the same limits as he would be liable under this section for his own act." Section 1, which independently provides for a type of premises liability,[4] also specifies that:

[i]f the deceased shall have been survived by a wife or husband and by more than one child surviving either in person or by issue, then one third to the use of such surviving spouse and two thirds to the use of such surviving children or their issue by right of representation.

Mass. Gen. Laws ch. 229, § 1(3).

 "The plain language of the statute permits recovery for those losses akin to loss of consortium." *Schultz v. Grogean*, 406 Mass. 364, 548 N.E.2d 180, 181 (1990). However, "the first clause of section 2 limits recovery to a class of persons. It provides for recovery of compensatory damages by 'the persons entitled to receive the damages recovered' and limits the class to those per-

---

4. Liability under section 1 is imposed when "the life of a person is lost by reason of a defect or a want of repair of or a want of a sufficient railing in or upon a way, causeway or bridge, the county, city, town or person by law obliged to repair the same shall, if it or he had previous reasonable notice of the defect or want of repair or want of railing, be liable in damages not exceeding four thousand dollars, *to be assessed with reference to the degree of culpability of the defendant.*" Mass. Gen. Laws ch. 229, § 1 (emphasis added). Until 1975, damages under section 2 were also assessed with reference to the degree

of negligence of the defendant. Since the 1975 amendment, however, damages under section 2 are assessed with reference to the "fair monetary value of the decedent to the persons entitled to receive the damages recovered." As the Massachusetts Appeals Court noted, one "can surmise that when [section] 2 was revised to introduce the compensatory principle of recovery, less than enough attention was paid to the compatibility of [section] 1." *Guy v. Johnson*, 15 Mass.App.Ct. 757, 448 N.E.2d 1142, 1144 (1983). That lack of attention has given rise to some of the interpretive problems discussed in the text above.

sons 'as provided in section [1].'" *See Burt v. Meyer,* 400 Mass. 185, 508 N.E.2d 598, 602 (1987) (adopting interpretation proposed in *Guy v. Johnson,* 15 Mass.App.Ct. 757, 448 N.E.2d 1142, 1144–45 (1983)). If the class of presumptive takers, as defined in section 1, is to recover under section 2, they must then prove that the decedent had monetary value to them. *See Burt,* 508 N.E.2d at 602; *Guy,* 448 N.E.2d at 1144.

We find no support in Massachusetts statutory or case law for the United States' contention that adult children must be financially dependent upon their decedent in order to be entitled to recover damages under section 2 of the wrongful death statute. To the contrary, the plain language of section 1(3) of the wrongful death statute makes the surviving spouse and children presumptive takers without mentioning any requirement that they be dependent. Moreover, the Supreme Judicial Court of Massachusetts has approved the award of damages to relatives who were not financially dependent upon the decedent. *See Santos v. Lumbermens Mut. Cas. Co.,* 408 Mass. 70, 556 N.E.2d 983, 988 n. 10 (1990) (parents of deceased adult unmarried child may recover damages under section 2 as "next of kin" for purposes of section 1); *Schultz,* 548 N.E.2d at 182 (same); *cf. Bratcher v. Galusha,* 417 Mass. 28, 627 N.E.2d 908 (1994) (father of deceased adult married child was not entitled to recover damages under section 2 because, under section 1, the surviving spouse was the only presumptive taker); *Norman v. Massachusetts Bay Transp. Auth.,* 403 Mass. 303, 529 N.E.2d 139, 142 (1988) (noting, in dicta, that if child had died rather than merely been injured, parents would have been entitled to recover under section 2 for loss of consortium); *Guy,* 448 N.E.2d at 1145 (father of deceased minor child was presumptive taker under section 1). Similarly, at least one federal district court has explicitly decided that adult children are presumptive takers in a claim under section 2 for the death of their parent. *See Knowlton v. Spillane,* 137 F.R.D. 196, 197 (D.Mass.1991); *cf. Poyser v.*

*United States,* 602 F.Supp. 436 (D.Mass. 1984) (mother of a minor daughter was a presumed taker under section 1(4)).

Indeed, a situation identical to this case seems to have arisen in *Burt v. Meyer,* 400 Mass. 185, 508 N.E.2d 598 (1987). After the trial of the wrongful death action brought by the executrix of the estate of the decedent, the jury awarded, *inter alia,* $174,000 in compensatory damages for the benefit of the widow, and $20,000 for the benefit of each of the decedent's four children by a previous marriage. On appeal, the adult children of the decedent argued that the distribution of an award under section 2 was subject to the constraints of section 1, which they claimed entitled them to two thirds of the entire award. The Supreme Judicial Court rejected this argument, holding that a presumptive taker is entitled to nothing beyond what it is proven at trial he or she lost as a result of the decedent's death. More importantly, however, the Court affirmed the original award to the children. Although the Court's decision does not specifically state that the children were non-dependent adults, that fact could fairly be inferred.[5]

■ Nevertheless, we affirm the trial judge's award of damages. The trial judge heard testimony from all of Mr. Hassey's children as to their relationship with him and the effect that his death has had upon them. The fact that the judge did so even after the Government had vigorously argued that the children were not entitled to recover under section 2 indicates that the judge correctly understood that Mr. Hassey's children were presumptive takers under section 1.

After hearing the children's testimony, the trial judge still chose to award them nothing. Upon reviewing the relevant portion of the trial transcript, we find that it would not have been error for the trial judge to find that the loss suffered by the decedent's children did not exceed such grief, anguish, and bereavement as one may normally expect upon the death of a parent. As the Administratrix admits in her brief, recovery under

5. The four children are full siblings. The two male children's surname, like their father's, is Meyer, but the two female children's surnames are Burt and Croteau, respectively. The most

likely explanation for this discrepancy is that the two female children were married. If so, they were adults and thus presumably no longer financially dependent on their father.

section 2 "was not intended to include components of 'grief, anguish and bereavement of the survivors.'" *MacCuish v. Volkswagenwerk, A.G.*, 22 Mass.App.Ct. 380, 494 N.E.2d 390, 398 (1986).[6]

 Finally, although the United States is technically correct in pointing out that the trial judge should have awarded damages to the Administratrix, rather than to Mrs. Hassey, the error is merely one of form. Pursuant to section 2 of the statute, "[d]amages under this section shall be recovered in an action of tort by the executor or administrator of the deceased." However, "the procedural framework of the wrongful death statute, through which an administrator brings an action on behalf of the next of kin, [does not make] each person who has suffered consortium-like damages any less injured. To hold otherwise would elevate form over substance, looking less at the question, 'who is injured,' and more at the question, 'who is technically bringing the suit.'" *Santos*, 556 N.E.2d at 988.

The Supreme Judicial Court has therefore approved of verdicts awarding different amounts to each person recovering under section 2. *See Burt*, 508 N.E.2d at 602 ($174,000 for widow and $20,000 for each child); *Guy*, 448 N.E.2d at 1145 ($37,786.06 for mother and $103.41 for father). Indeed, in *Guy*, the Court approved of the decision of the probate judge to distribute the award of compensatory damages obtained in a wrongful death suit in accordance with the jury verdict.

The trial judge in this case, therefore, did not err in determining the specific amount that Mrs. Evelyn Hassey was entitled to receive. Instead, the only error he committed was to enter judgment in her name, rather than in the name of the Administratrix. The error is easily corrected. We thus resolve to modify the judgment to clarify that the nominal recipient of the award is the Administratrix of the Estate of Alfred J. Hassey, for the benefit of Evelyn Hassey.

Of course, when the assets of the estate are distributed, the probate judge will distribute the compensatory damages awarded in this suit in accordance with the trial judge's findings.

For the foregoing reasons, we *affirm* the judgment entered by the district court, as modified by this opinion.

6. The Appeals Court noted that although the version of the wrongful death statute that was originally passed by the Massachusetts legislature provided for recovery of fair compensation for grief, anguish, and bereavement, that provision was deleted from the bill before it was signed into law. *See MacCuish*, 494 N.E.2d at 398–99.