**Paul Thomas BOROSAVAGE, Administrator of the Estate of Eugene Borosavage, Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

**Civil Action No. 07–11657–NMG.**

United States District Court, D. Massachusetts.

Nov. 3, 2009.

---

Andrew C. Meyer, Jr., Adam R. Satin, Lubin & Meyer, P.C., Boston, MA, for Plaintiff.

Anita Johnson, Christine J. Wichers, United States Attorney's Office, Boston, MA, for Defendant.

## MEMORANDUM OF DECISION

GORTON, District Judge.

This is a wrongful death action brought by Plaintiff Paul Thomas Borosavage ("Paul"), the appointed Administrator of the Estate of Eugene Borosavage ("Eugene", "Mr. Borosavage" or "the Decedent"), against the United States pursuant to the Federal Tort Claims Act ("FTCA"), 42 U.S.C. § 233. The plaintiff claims the Decedent's primary care physician committed medical malpractice and seeks damages for negligence and failure to gain informed consent.

The parties conducted a bench trial before this Court in early October, 2009 and submitted post-trial memoranda for the Court's consideration. The Court now publishes its findings of fact and conclusions of law pursuant Fed.R.Civ.P. 52(a).

## I. *Findings of Fact*

1. Eugene Borosavage died on March 5, 2005, at the age of 82, survived by his wife, Anne, and their only son, Paul.

2. Dr. Beverly F. Greenwold, M.D. is a United States government employee who practices at the West Roxbury Veterans Administration Medical Center ("West Roxbury VA"). She was Eugene's primary care physician for over ten years.

3. Prior to his death, Eugene had a medical history that included, *inter alia*, coronary artery disease with a prior bypass surgery, congestive heart failure, a permanent pacemaker, high blood pressure and hypertension. He also had an atrial flutter which, due to a risk of blood clots, required him to take the anti-coagulation drug, Coumadin.

### A. Early February Medical Visits

4. On February 4, 2005, Eugene underwent a bladder cystoscopy.

5. On February 6, Eugene went to the Emergency Room ("ER") at the West Roxbury VA complaining of dizziness, nausea and vomiting. In light of the prior surgery, he was diagnosed with vertigo and a possible urinary tract infection and given antibiotics.

6. On February 9, Eugene returned to the ER to follow up on blood cultures that had been drawn. He again reported dizziness. Because the cultures confirmed an infection, he was told to continue on antibiotics.

7. On February 16, Eugene returned to the ER complaining of fatigue and coughing. He was diagnosed with a respiratory infection and sent home to continue with antibiotic treatment.

### B. February 24, 2005

8. Before noon on February 24, 2005, Paul called the West Roxbury VA stating that his father was not himself. He reported that Eugene was forgetful, sluggish and irritable.

9. Paul and Anne accompanied Eugene to see Dr. Greenwold that afternoon. This was abnormal and Dr. Greenwold stated that Paul had not come with Eugene to any visit prior to February 24, 2005.

10. Dr. Greenwold recorded Paul's complaint that Eugene was tired, confused, generally weak and had lost weight and his appetite. Paul testified that he also told Dr. Greenwold

> that something was different today than it had been in the past .... in talking to him, he just had—he glazed over. He did not—he seemed to not remember what he was saying, stop mid-sentence in searching for words.

11. Paul told Dr. Greenwold that Eugene had been falling asleep in the waiting room and Dr. Greenwold noted that he continued to fall asleep during his visit in her office. Eugene was typically energetic and lucid and Dr. Greenwold found his nodding off to be remarkable.

12. Dr. Greenwold performed various tests, including a mental status exam. Eugene failed the "serial 7s" portion of the exam.

13. Based upon what she learned during Eugene's office visit, Dr. Greenwold recorded her "impression" of his condition. The first item she listed was a "change in mental status". Next, she noted the need to rule out a cerebral vascular accident ("CVA"), sometimes referred to as subdural bleeding.

14. Dr. Greenwold scheduled various tests. First, she ordered blood cultures to be taken that day. Second, in her examination note, Dr. Greenwold ordered a CT scan "ASAP" and it was subsequently scheduled for five days later.

15. The Decedent's latest INR reading before Dr. Greenwold's exam on February 24, 2005 had occurred on February 9, 2005. At that examination, Dr. Greenwold also told Eugene to follow up with the Coumadin clinic, which was responsible for checking his INR level. That was a routine instruction for patients taking Coumadin.

## C. February 27, 2005

16. At about 12:15 p.m., Anne Borosavage noticed that Eugene was slurring his speech. She called Paul who came and took Eugene to the ER at the West Roxbury VA. At the hospital, Eugene's speech became nonsensical.

17. Eugene had a CT scan at 1:45 p.m., 35 minutes after he arrived at the ER. It revealed a subdural hematoma with heterogeneous blood, including areas of active bleeding and older blood. The radiologist's report of the scan described a "subacute" bleed, which is typically less than one week old.

18. Eugene's INR was 3.8, well above the target range of 2–3. INR measures the blood's consistency and an INR of 3.8 means that Eugene's blood was overly thin and indicates an increased risk of spontaneous bleeding.

19. Eugene was prepared for transfer from the West Roxbury VA to Massachusetts General Hospital ("MGH"). During that time, his left pupil enlarged, his toes turned upward and he became unconscious. These are symptoms of a worsening subdural hematoma.

20. After arriving at MGH, Eugene received a second CT scan at 5:45 p.m. It showed a massive expansion of the left-side acute hematoma due to an actively bleeding artery.

21. After consultation with the family, an emergency craniotomy was performed to remove the hematoma.

22. Several statements in the operative reports from that surgery describe older blood found in Eugene's subdural space.

23. Eugene survived the surgery but remained in a coma. On March 5, 2005, after consulting with doctors, Eugene's family elected to limit his treatment to comfort measures only and he died that day.

## II. *Conclusions of Law*

1. Pursuant to the Federal Tort Claims Act, the United States may be held liable for

> death caused by the negligent or wrongful act or omission of any employee . . . while acting within the scope of his office or employment . . . if a private person would be liable [under] the law of the place where the act or omission occurred.

28 U.S.C. § 1346(b)(1). Thus, Massachusetts law applies.

### Negligence

2. Under the so-called Massachusetts Wrongful Death Statute, a person who "by his negligence causes the death of a person . . . shall be liable in damages. . . ." M.G.L. c. 229, § 2.

■ 3. Plaintiff must establish the applicable standard of care and demonstrate both that a defendant physician breached that standard and that the breach caused the patient's harm. *Palandjian v. Foster,* 446 Mass. 100, 104, 842 N.E.2d 916 (2006).

4. Plaintiff must establish each element by a preponderance of the evidence. *Rosario v. United States,* 824 F.Supp. 268, 278–78 (D.Mass.1993) (applying Massachusetts law).

■ 5. In general, a medical malpractice plaintiff may carry his or her burden of proof on the issues of negligence and causation only with the assistance of expert testimony. *Mitchell v. United States,* 141 F.3d 8, 13 (1st Cir.1998).

### Standard of Care

■ 6. The proper standard is whether the physician, if a general practitioner, has exercised the degree of care and skill of the average qualified practitioner, taking into account the advances in the profession. *Brune v. Belinkoff,* 354 Mass. 102, 109, 235 N.E.2d 793 (1968).

7. The standard of care in this case is that of a primary care physician working in Massachusetts in 2005.

8. The standard of care in this case is determined based upon: a) treatment of an 82–year–old patient on Coumadin who had undergone hospital care four times within the preceding three weeks, b) a report of the patient's son, who accompanied the Decedent to the doctor for the first time, that his father was confused and not himself, and c) an examination of the patient who, although typically energetic, fell asleep in the doctor's office during that examination and exhibited a change in mental status which alerted the physician to the need to rule out a cerebral vascular accident.

■ 9. Based upon credible expert testimony, the Court concludes that the standard of care in this case required Dr. Greenwold, Mr. Borosavage's primary care physician, in order to rule out the possibility of a life-threatening subdural hematoma, to order an immediate CT scan and an immediate INR test on February 24, 2005.

### Breach of Duty

10. With respect to the CT scan scheduled for five days later, regardless of a) the level of urgency Dr. Greenwold intended by "ASAP" and b) whether she scheduled the CT scan herself or not, Mr. Borosavage's condition required more prompt attention and action by Dr. Greenwold. With respect to INR testing, the routine instruction to follow up with the Coumadin

clinic was not made with the requisite degree of urgency.

11. Based upon credible expert testimony and the foregoing findings of fact, the Court concludes that Dr. Greenwold's actions fell below the requisite standard of care owed to the plaintiff's decedent, Eugene Borosavage.

**Causation**

■ 12. Plaintiff is not required to show the exact cause of injuries or to exclude all possibility that they resulted without fault on the part of the defendant. *Woronka v. Sewall,* 320 Mass. 362, 365, 69 N.E.2d 581 (1946).

■ 13. Plaintiff must show that the Decedent's death was, more probably than not, a result of the physician's negligence. *Harlow v. Chin,* 405 Mass. 697, 702, 545 N.E.2d 602 (1989).

■ 14. In light of ample evidence that bleeding occurred prior to February 27 and Eugene's clinical symptoms on February 24, and based upon credible expert testimony, the Court concludes that, had Dr. Greenwold ordered an immediate CT scan on February 24, it would have revealed blood in Eugene's subdural space. That, in turn, would have prompted corrective measures and probably hospitalization to curtail the current bleeding and to decrease any risk of future bleeding. Those measures would have included reverse anti-coagulation therapy and the immediate cessation of Coumadin in take in order to lower the patient's INR to 1.

15. Based upon credible expert testimony, the Court concludes that had the CT scan been ordered on February 24 and, as a result, had reverse anti-coagulation measures been taken to lower Eugene's INR to 1, it is more probable than not that Mr. Borosavage would not have suffered a spontaneous arterial bleed on February 27,

2005 and therefore would not have died on March 5, 2005.

16. Thus, the Court concludes that the negligence of Dr. Greenwold caused the Decedent's death.

**Informed Consent**

17. With respect to the law of informed consent in Massachusetts,

> a physician owes to his patient the duty to disclose in a reasonable manner all significant medical information that the physician possesses or reasonably should possess that is material to an intelligent decision by the patient. . . . The information a physician reasonably should possess is that information possessed by the average qualified physician. . . .

*Harnish v. Children's Hosp. Med. Center,* 387 Mass. 152, 155–156, 439 N.E.2d 240 (1982).

■ 18. Nevertheless, Massachusetts appellate courts have thus far "declined to allow an action for failure to inform based on the same facts necessary to establish negligence for failure to diagnose." *Roukounakis v. Messer,* 63 Mass.App.Ct. 482, 826 N.E.2d 777, 781 (2005).

■ 19. The Court concludes that, in attempting to prove his claim of lack of informed consent, plaintiff relied entirely upon his expert's testimony about what Dr. Greenwold "should have known" and presumably should have told the Borosavages. As such, the informed consent claim runs exactly parallel to plaintiff's negligence claim and is, therefore, not actionable.

20. As in *Roukounakis,* the cornerstone of the plaintiff's claim here is failure properly to diagnose and recognize the need for further tests and treatment. That alleged failure gives rise to a claim for negligence but not to a claim on principles of informed consent. *Id.* at 782.

21. Accordingly, the Court concludes that plaintiff has failed to prove his claim for failure to gain informed consent.

**Damages**

22. Under the Massachusetts Wrongful Death Statute, damages are:

the fair monetary value of the decedent to the persons entitled to receive the damages recovered . . . including but not limited to compensation for the loss of the reasonably expected net income, services, protection, care, assistance, society, companionship, comfort, guidance, counsel, and advice of the decedent to the persons entitled to the damages recovered.

M.G.L. c. 229, § 2.

23. "The plain language of the [wrongful death] statute permits recovery for those losses akin to loss of consortium." *Schultz v. Grogean,* 406 Mass. 364, 366, 548 N.E.2d 180 (1990).

24. Adult children need not be financially dependent upon the decedent in order to recover under the statute. *Mitchell v. United States,* 141 F.3d 8, 20 (1st Cir.1998).

25. The Court concludes that Anne and Paul Borosavage suffered loss of consortium as a result of Eugene's death but that even had Dr. Greenwold not acted negligently, Eugene would not have survived beyond the date of this verdict.

26. The Court concludes that a fair and equitable award of damages to the plaintiff for loss of consortium is $150,000.

In summary, it is not that Dr. Greenwold was negligent in what she did on February 24, 2005 but rather in what she did not do. She did not sufficiently "rule out" a CVA or follow up to see that the Decedent got a CT scan "ASAP" (which, regardless of the fact that the term is not as urgent as "STAT" in medical jargon, required some action sooner than five days later). Dr. Greenwold also did not follow up on her "change of mental status" notation or on the serious, expressed concerns of Decedent's son and wife in her office on February 24. Nor, does it seem, did Dr. Greenwold attribute sufficient significance to the fact that Mr. Borosavage fell asleep in her presence during the exam (for the first time during the ten-plus years that she had been his primary care physician) and was at least somewhat confused in her presence (based upon the serial 7s test) which he had never been before.

Dr. Greenwold recognized the importance of Decedent's INR during the office visit but did not have a reading more current than 15 days old and, nevertheless, did not advise Mr. Borosavage (or his family) to have it checked that day. Although Dr. Greenwold's physical examination of Decedent on February 24 was thorough and appropriate, her follow up of certain troubling signs noted, one of which (i.e., "r/o cva") was of possible, life-threatening significance, fell below the standard of care that was due.

Concerning causation, we will never know for certain whether additional testing on February 24 would have extended Decedent's life but one thing is more probable than not: had Decedent had a CT scan and/or INR reading that day those tests would have revealed abnormalities such that further treatment, reverse anticoagulation therapy and/or hospitalization would have been called for and Mr. Borosavage's chance of avoiding (or, at least, surviving) the events of February 27 and of enjoying a somewhat longer life would have been dramatically improved.

**ORDER**

In accordance with the foregoing Memorandum of Decision, the United States, through its agent Dr. Greenwold, is found

to have negligently caused the death of Eugene Borosavage but is not held liable under a claim of failure to gain informed consent. Pursuant to the Massachusetts Wrongful Death Statute, damages for Dr. Greenwold's negligence are awarded to the plaintiff in the amount of $150,000.

So ordered.