# United States Court of Appeals
## For the First Circuit

No. 08-1831

DILMA PAGÉS-RAMÍREZ; MICHAEL PIETRI-POZZI; CONJUGAL PARTNERSHIP
PIETRI-POZZI; G.P.P., minor,

Plaintiffs, Appellants,

v.

DR. ANTONIO RAMÍREZ-GONZÁLEZ; SINDICATO DE ASEGURADORES PARA LA
SUSCRIPCIÓN CONJUNTA DE SEGUROS DE RESPONSIBILIDAD PROFESIONAL
MÉDICO-HOSPITALARIA (SIMED),

Defendants, Appellees.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF PUERTO RICO

[Hon. Jaime Pieras, Jr., U.S. District Judge]

Before

Torruella, Lipez, and Howard, Circuit Judges.

David Efron, with whom Joanne V. González-Varon was on brief,
for appellants.
Eugene F. Hestres-Vélez, with whom Ramonita Dieppa Law
Offices, Ramonita Dieppa-González, Bird Bird & Hestres, P.S.C., E.
Francois Hestres-Rodríguez, and María Z. Trigo-Ferraioulli were on
brief, for appellees.

May 19, 2010

**LIPEZ, Circuit Judge.** In this diversity malpractice action, the appellants claim that their son, G.P.P., suffered catastrophic injuries during and immediately following his birth because of the negligence of appellee, Dr. Antonio Ramírez-González, the obstetrician who performed G.P.P.'s delivery. After the plaintiffs presented their case-in-chief to a jury, the district court granted judgment as a matter of law in favor of Ramírez-González. The Court concluded that the plaintiffs' evidence was insufficient to establish two elements of a medical malpractice claim: a departure from the relevant standard of care and a causal relationship between the departure and the harm to their son.

On appeal, the plaintiffs argue that the district court committed reversible error when it made several evidentiary rulings that resulted in the exclusion of expert testimony. Because we agree that the district court improperly limited the testimony of one of the plaintiffs' experts, Dr. Carolyn Crawford, we vacate the judgment for Ramírez-González and remand for further proceedings.

**I.**

**A. Background**

Consistent with the applicable standard of review for a judgment as a matter of law, we recite the relevant facts in the light most favorable to the plaintiffs. See EnergyNorth Natural Gas, Inc., v. Century Indem. Co., 452 F.3d 44, 46 (1st Cir. 2006).

-2-

Defendant, Dr. Antonio Ramírez-González,[1] was plaintiff Dilma Pagés-Ramírez's physician during her pregnancy with G.P.P. and attended at his birth. Pagés-Ramírez visited Dr. Ramírez-González on at least seven occasions for prenatal care during her pregnancy. She was expected to deliver on or around June 1, 2005.

On May 19, 2005, Pagés-Ramírez arrived at Hospital Auxilio Mutuo in active labor. When her labor did not progress over the next few hours, she received intravenous Pitocin, a drug used to increase the frequency of contractions, her water was artificially broken, and an epidural anaesthetic was begun. When Pagés-Ramírez was fully dilated, an attempt was made to use vacuum extraction to deliver G.P.P. That attempt was unsuccessful. Ramírez-González eventually delivered G.P.P. by cesarean section ("c-section").

After the delivery, Pagés-Ramírez required the transfusion of four units of blood. She remained hospitalized until May 24, 2005. G.P.P. was in critical condition when he was delivered. He remained in intensive care until August 5, 2005, when he was discharged to another hospital where he continued to receive treatment for brain damage and physical abnormalities. G.P.P.'s current prognosis is bleak. He has permanent brain damage

---

[1] Ramírez-González has a medical malpractice policy issued by Insurers Syndicate for the Joint Underwriting of Medical-Hospital Professional Liability Insurance (SIMED). SIMED is also a named defendant in this action.

and has been diagnosed with cerebral palsy. Due to organ damage, he must be fed through a tube in his abdominal wall. Those conditions are not expected to improve over time.

On May 11, 2007, Pagés-Ramírez brought this suit in federal district court along with her husband, Michael Pietri Pozzi, on behalf of themselves and G.P.P. (collectively "the plaintiffs"), alleging that medical malpractice by Ramírez-González and Hospital Español Auxilio Mutuo de Puerto Rico caused catastrophic injury to G.P.P.[2] Early in the litigation, the plaintiffs reached a confidential settlement with the hospital and its insurer, Admiral Insurance Company.

The plaintiffs' remaining malpractice claims against Ramírez-González alleged, specifically, that Ramírez-González departed from the standard of care by, among other things, failing to elicit a comprehensive obstetrical history from Pagés-Ramírez, failing to estimate G.P.P.'s fetal weight and to enter it into the delivery record, attempting a mid-pelvic delivery by vacuum extraction, failing to use an internal fetal heart monitor, and failing to timely call for a c-section delivery. The plaintiffs claimed that those deviations from the standard of care resulted in profound multi-organ damage to G.P.P., as well as respiratory

---

[2] The plaintiffs are residents of Orlando, Florida. The defendant is a resident of Puerto Rico, where the events described in the complaint occurred. The district court had jurisdiction pursuant to 28 U.S.C. § 1332(a)(2).

-4-

failure, sepsis, asphyxia and seizures. They further alleged that they have suffered emotional anguish as a result of the trauma to G.P.P., and that, due to their limited economic resources, G.P.P. has not been able to receive sufficient medical care or therapy.

**B. The Trial**

Trial by jury began on May 1, 2008. The plaintiffs proposed to call three medical expert witnesses as part of their case-in-chief. One of those experts, an obstetrician, failed to appear because of illness, and the trial court ruled that his deposition testimony could not be admitted into evidence in his absence. When the plaintiffs called their next two medical experts, a specialist in neonatal/perinatal medicine[3] and a neurologist, the court limited the testimony of each one, ruling that the doctors were not qualified to offer testimony on either the appropriate standard of care for an obstetrician in Ramírez-González's position, or on the issue of whether any deviations from the standard of care caused the injuries to G.P.P.

Predictably, when the plaintiffs had finished presenting their case, the court had to grant Ramírez-González's motion for judgment as a matter of law. Without the testimony of their missing expert and with their two remaining medical experts

---

[3] Perinatology is the branch of medicine concerned with the care of the mother and fetus during pregnancy, labor, and delivery. Neonatology is the branch of medicine concerned with the care, development, and diseases of newborn infants.

precluded from testifying on the standard of care and causation, the plaintiffs did not have enough evidence to support their claims.

Although the plaintiffs contest all of the abovementioned evidentiary rulings on appeal, we focus here on the court's ruling that the plaintiffs' expert in neonatal and perinatal medicine, Dr. Carolyn Crawford, would not be permitted to offer testimony on the standard of care and causation. As we explain, that erroneous ruling alone requires a new trial.

## II.

### A. Elements of Medical Malpractice

This diversity suit is governed by the substantive law of Puerto Rico. See Marcano Rivera v. Turbado Med. Ctr., 415 F.3d 162, 167 (1st Cir. 2005). In Puerto Rico, as in many jurisdictions, in order to prevail on a medical malpractice claim, "a party must establish (1) the duty owed; (2) an act or omission transgressing that duty; and (3) a sufficient causal nexus between the breach and the harm." Id. (citation omitted). In the context of medical malpractice actions, the Puerto Rico Supreme Court has explained that a physician's duty is "to offer his or her patient that medical care, attention, skill, and protection that, in the light of the modern means of communication and education, and pursuant to the current status of scientific knowledge and medical practice, meets the professional requirements generally

-6-

acknowledged by the medical profession." Santiago Otero v. Méndez, 1994 P.R.-Eng. 909,224 (1994). To prevail, a plaintiff must prove by a preponderance of the evidence both that the standard of care was not met, and that the failure to meet an acceptable standard caused the harm. Id. In order to determine the applicable standard of care in a medical malpractice action and to make a judgment on causation, a trier of fact will generally need the assistance of expert testimony. See Rojas-Ithier v. Sociedad Espanola de Auxilio Mutuo y Beneficiencia de P.R., 394 F.3d 40, 43 (1st Cir. 2005) (citing Rolon-Alvarado v. Municipality of San Juan, 1 F.3d 74, 78 (1st Cir. 1993)); Lama v. Boras, 16 F.3d 473, 478 (1st Cir. 1994)).

**B. Admission of Expert Testimony**

The admission of expert testimony is governed by Federal Rule of Evidence 702. Rule 702 requires that expert testimony be (1) "based upon sufficient facts or data," (2) "the product of reliable principles and methods," and (3) that the witness apply "the principles and methods reliably to the facts of the case." We have described the trial judge as the gatekeeper in applying Rule 702's admissibility criteria. Gaydar v. Sociedad Instituto Gineco-Quirurgico y Planificacion Familiar, 345 F.3d 15, 24 (1st Cir. 2003). The judge must decide "whether the scientific, technical, or other specialized knowledge [the expert] offers 'will assist the trier better to understand a fact in issue.'" Id. (quoting United

-7-

States v. Alzanki, 54 F.3d 994, 1005 (1st Cir. 1995)). The judge must ensure that an expert's testimony "'both rests on a reliable foundation and is relevant to the task at hand.'" United States v. Mooney, 315 F.3d 54, 62 (1st Cir. 2002) (quoting Daubert v. Merrell Dow Pharm., 509 U.S. 579, 597 (1993)). As part of its inquiry, the trial court must "determine whether the putative expert is qualified by knowledge, skill, experience, training, or education," to offer testimony. Mitchell v. United States, 141 F.3d 8, 14 (1st Cir. 1998) (citation omitted). We have explained, however, that "[t]he proffered expert physician need not be a specialist in a particular medical discipline to render expert testimony relating to that discipline." Gaydar, 345 F.3d at 24.

In Mitchell, we held that an expert, an internist with a specialty in hematology and oncology, was qualified to opine on the standard of care that should have been met by a gastroenterologist performing a colonoscopy. 141 F.3d at 15. Similarly, in Gaydar, we found that "the mere fact that [an expert] was not a gynecologist does not mean that he was not qualified to give expert testimony regarding [the plaintiff's] pregnancy." 345 F.3d at 24.

Although credentials such as board certification in a particular medical specialty may indicate that an expert's opinion is "entitled to greater weight," such certification has "never been held a prerequisite to qualification as an expert medical witness." Alvarado v. Weinberger, 511 F.2d 1046, 1049 (1st Cir. 1975) (per

-8-

curiam).  Indeed, we have noted that it would be an abuse of discretion to exclude testimony that would otherwise "assist the trier better to understand a fact in issue," simply because the expert does not have the specialization that the court considers most appropriate.  Gaydar, 345 F.3d at 24-25 (citing Holbrook v. Lykes Bros. S.S. Co., 80 F.3d 777, 782 (3d Cir. 1996) (finding an abuse of discretion when the trial judge prohibited physician specializing in internal medicine from opining on plaintiff's cancer because he was not an oncologist)).

## C. Dr. Crawford's Credentials

Dr. Carolyn Crawford is a specialist in pediatrics and neonatal and perinatal medicine.  The pretrial order specified that the plaintiffs would call her as an "expert in neonatology regarding her review of the pertinent records, the standards of care within her field of expertise applicable to this case, the defendants' departures from such standards, about [G.P.P.'s] condition and the causal relationship between said condition and the defendants' departures."  Upon Ramírez-González's motion, the parties conducted a Daubert inquiry outside the presence of the jury into Dr. Crawford's credentials.  See Daubert, 509 U.S. 579. At that hearing, Dr. Crawford was asked to elaborate on her qualifications, which we summarize here.

After obtaining her medical degree, Dr. Crawford completed a pediatric residency followed by a fellowship in

-9-

neonatal-perinatal medicine. She is board certified in neonatal-perinatal medicine. As a specialist in neonatal-perinatal medicine, Dr. Crawford deals with "problems during pregnancy, labor, and delivery that [a]ffect [the baby]." She served for several years as the medical director of the Southern New Jersey Perinatal Cooperative. In that role, she developed a statewide educational program called Perinatal Emergencies. Her team presented a "standard of care, that is the appropriate thing to do in such a situation. For instance, with fetal monitoring, that when uterine hyper stimulation occurs, that you did a number of things. You turn off the Pitocin. You give fluids, oxygen, change position. Subsequently, we recommended that [terbutaline], which is a uterine relaxation drug, be considered to relax the uterus, allow better blood flow and oxygen to the fetus; and that the patient be evaluated for a timely delivery."

Dr. Crawford has written chapters for several published medical books. Most relevantly, she authored a chapter on fetal asphyxia, which covers the administration of Pitocin, and a chapter entitled, "Differential Diagnosis of Respiratory Distress," which was intended "to help physicians understand when they have a baby that wasn't breathing or a baby that had breathing problems how to differentiate what the cause of those were."

Although Dr. Crawford does not perform c-sections, she has served as a consultant in high-risk deliveries and "set the

wheels in motion" when she determined that a c-section was indicated. Thus, she "can identify the problems and prepare the patient." She has been "trained to identify ominous patterns on a fetal monitor and to evaluate whether the patient is likely to be able to deliver quickly vaginally or whether a cesarean section will be needed." She also conducts peer review evaluations of unexpected outcomes after delivery. Such review involves taking into account "the obstetrical care, the obstetrical nursing care, the delivery care, the neonatal management." Dr. Crawford has previously been qualified to testify on departures from the standard of care in obstetrics in both state and federal cases.

**D. The Decision to Limit Dr. Crawford's Testimony**

After hearing the evidence outlined above, the district court issued an order precluding Dr. Crawford from providing "her opinion as to obstetrical standards of care, departures from these standards, or causation in this case." The court agreed with Ramírez-González's argument that "because Dr. Crawford's experience and training is not in obstetrics and gynecology, she cannot provide expert testimony regarding the alleged departures in the standards of care committed by Defendant [], an obstetrician-gynecologist." Citing Dr. Crawford's lack of board certification in obstetrics and gynecology and her statement that it is typically an obstetrician/gynecologist who "makes the final decisions regarding a woman in labor," the court ruled that Dr. Crawford

-11-

would not be permitted to "testify as to the events that occurred before and during the cesarean section," and that she could not "provide any testimony pertaining to the cause of [G.P.P.]'s injuries." Dr. Crawford proceeded to testify only about G.P.P's medical conditions and the testing that he underwent immediately following his birth.

We review a trial court's decision to admit or exclude expert testimony for abuse of discretion. Gaydar, 345 F.3d at 24. A "district court enjoys substantial discretion to decide whether to admit or exclude relevant expert testimony." Mitchell, 141 F.3d at 14. As we described above, the judge's task is to ensure that the expert's testimony "'both rests on a reliable foundation and is relevant to the task at hand.'" Mooney, 315 F.3d at 62 (quoting Daubert, 509 U.S. at 597). In carrying out this responsibility, the trial court must bear in mind that an expert with appropriate credentials and an appropriate foundation for the opinion at issue must be permitted to present testimony as long as the testimony has a "tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Fed. R. Evid. 401. An unduly restrictive review of the relevant expertise of a physician is incompatible with what we have characterized as a liberal standard of relevance. Mitchell, 141 F.3d at 14 (quoting

-12-

<u>Daubert</u>, 509 U.S. at 587) (noting that Rule 401's "'basic standard of relevance [] is a liberal one'").

In light of these standards, we conclude that the district court abused its discretion when it refused to permit Dr. Crawford to testify on the relevant standard of care and causation. The court mistakenly relied on Dr. Crawford's lack of board certification in obstetrics and gynecology to preclude her from testifying. In its Opinion and Order granting Ramírez-González's motion for judgment as a matter of law, the court explained:

> Dr. Crawford testified that she was not board-certified in OB/GYN, and that she had no privileges to administer [P]itocin to a patient or to perform a cesarean section. She further testified that although she serves as a consultant at high-risk[] births, it is the OB/GYN who actually delivers the baby and makes the final decisions regarding the delivery.
> Accordingly, the Court rule[s] that Dr. Crawford's testimony be limited to exclude any testimony regarding OB/GYN standards of care, departures from OB/GYN standards of care, and causation.

The court thus found that because Dr. Crawford herself is not certified to administer Pitocin or perform c-sections, she would not be qualified to opine on the alleged departures from the standards of care committed by Ramírez-González, an obstetrician-gynecologist.

That logic is flawed. The dispositive question is not whether an expert is board certified in a particular medical specialty. Rather, the Rules of Evidence require that the judge

-13-

admit expert testimony relevant to the disposition of the case when it will assist the trier of fact in understanding a fact in issue and rests on a reliable foundation. See Fed. R. Evid. 702; Mooney, 315 F.3d at 62; Gaydar, 345 F.3d at 24.

Dr. Crawford's credentials easily meet and, indeed, surpass the standard for admissibility of expert testimony. She is board-certified in, and practices, perinatal and neonatal medicine. As enumerated above, she has published book chapters that deal with the administration of Pitocin. She has served as a consultant at high-risk deliveries and has recommended that c-sections be performed. She conducts peer review evaluations that involve taking into account the obstetrical and delivery care that a patient is given, and she has worked on guidelines for responding to perinatal emergencies. She has "scientific, technical, [and] other specialized knowledge" that "will assist the trier better to understand a fact in issue." Gaydar, 345 F.3d at 24 (citation omitted). Her knowledge "rests on a reliable foundation," Mooney, 315 F.3d at 62, i.e., her medical education and many years of experience in the field. Her testimony is "relevant to the task at hand." Id. Indeed, without Dr. Crawford's testimony on causation and the standard of care, the plaintiffs were unable to present evidence on two elements of their case.

Trying to defend the district court's ruling on a different ground, Ramírez-González argues that, whether or not she

was properly credentialed to serve as an expert, Dr. Crawford's testimony was correctly excluded because the plaintiffs did not disclose her prior to the trial as an expert in the appropriate standard of care and causation. In making this argument, Ramírez-González attempts to analogize the district court's limitation on Dr. Crawford's testimony in this case to the district court's preclusion of expert testimony that we recently upheld in Martínez-Serrano v. Quality Health Services. of Puerto Rico, Inc., 568 F.3d 278 (1st Cir. 2009). In that case, the plaintiffs "attempted to reformulate their theory of liability (and, thus, dramatically shift the focus of their expert's opinion testimony)." Id. at 283. We found that the substantive change in the opinion being offered by an expert for the plaintiffs amounted to a failure to meet the district court's deadline for "identification of experts and the disclosure of their opinions." Id. We refused to find an abuse of discretion when the trial court precluded that expert from offering testimony because of the untimeliness of the disclosure of his opinions. Id. at 284. We noted that "the plaintiffs had flouted a clearly expressed discovery deadline without any apparent justification and under circumstances redolent of strategic behavior." Id.

Ramírez-González's effort to cast the events in this case into the mold of Martínez-Serrano is unavailing. Although there may be some merit to Ramírez-González's contention that Dr. Nathanson

was to be the plaintiffs' principal witness on causation and the standard of care, the record shows that Dr. Crawford was set to testify on those issues as well. The pretrial order stated that Dr. Crawford would "testify as an expert in neonatology regarding her review of the pertinent records, the standards of care within her field of expertise applicable to this case, the defendants' departures from such standards, about [G.P.P.]'s condition as it relates to her field of expertise, and the estimated cost of his life care."[4] Moreover, her report, which was provided to Ramírez-González well in advance of the trial,[5] dealt extensively with G.P.P.'s treatment and concluded with a section entitled, "Causation: Opinions." There is no support in the record for Ramírez-González's claim that he would have been surprised and unfairly prejudiced if Dr. Crawford had been allowed to testify on the standard of care and causation.[6] Moreover, it is noteworthy

---

[4] Although this reference to neonatology, viewed in isolation, might suggest that Dr. Crawford was only going to testify about the care and development of G.P.P. after his birth, the actual description of the scope of Dr. Crawford's testimony and the substance of the section of her report entitled, "Causation: Opinions," see infra n. 6, made it abundantly clear that her proposed testimony would not be limited to the field of neonatology.

[5] The report was attached as an exhibit in support of the plaintiffs' opposition to the defendant's motion for summary judgment and added to the docket in March 2008, three months prior to the trial. As such, it was served on defendant.

[6] In the section of her report entitled "Causation: Opinions," Dr. Crawford wrote, among other things:

that the district court does not mention a failure to disclose the substance of Dr. Crawford's testimony in its opinion and order limiting Dr. Crawford's testimony. It is clear that the district court instead based its decision to limit Dr. Crawford's testimony on its erroneous assessment of her credentials after hearing her testify in the <u>Daubert</u> hearing.

Judgment vacated. Remanded for further proceedings consistent with this opinion. Costs are awarded to the appellants.

<u>So ordered.</u>

---

Pitocin was used indiscriminately resulting in uterine hyperstimulation and impaired teroplacental perfusion which depleted his fetal reserves. The abnormal labor pattern for a multigravida was not appreciated. . . .
The records do not indicate any awareness that [G.P.P.] was such a big baby and the prenatal records were silent in terms of fundal height. . . . Vacuum use was inappropriate and traumatic adding further insult to injury and resulted in a prolonged (32 minute) bradycardia. The [c-section] was delayed which contributed to the profound acidosis and CNS insult that he sustained.