# United States Court of Appeals
## For the First Circuit

No. 09-1758

HAZEL I. CRUZ-VÁZQUEZ, ET AL.,

Plaintiffs, Appellants,

v.

MENNONITE GENERAL HOSPITAL, INC., ET AL.,

Defendants, Appellees.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF PUERTO RICO

[Hon. Jaime Pieras, Jr., U.S. District Judge]

Before

Torruella, Lipez and Howard, Circuit Judges.

Pedro F. Soler-Muñiz for plaintiffs.
José Héctor Vivas, with whom Vivas & Vivas was on brief, for
defendants Brenda M. Torres Perez, her husband, and their conjugal
partnership.
Roberto Ruiz Comas for defendants Edward Gomez-Torres and the
conjugal partnership Gomez-Torres.
Anselmo Irizarry-Irizarry, with whom Matta & Matta, PSC Law
Firm was on brief, for defendant General Mennonite Hospital.

July 26, 2010

**LIPEZ, Circuit Judge**.  In this action filed pursuant to Puerto Rico's medical malpractice law, Articles 1802 and 1903 of the Puerto Rico Civil Code, P.R. Laws Ann. tit. 31, §§ 5141-42, and the federal Emergency Medical Treatment and Active Labor Act ("EMTALA"), 42 U.S.C. § 1395dd, the district court excluded the testimony of the plaintiffs' lone expert witness at trial.  As a result of the court's ruling, the plaintiffs failed to offer proof on crucial elements of their case, and the district court consequently granted judgment as a matter of law for the defendants.  The plaintiffs appeal, arguing that the district court abused its discretion when it excluded the expert testimony and that its award of judgment for the defendants must be vacated.  We agree.

## I.

The plaintiffs brought this action against Mennonite General Hospital, two physicians, and several others, alleging that the defendants' negligence caused the premature birth of their daughter and her death two days later, in violation of Puerto Rico law.  They also alleged that the hospital violated EMTALA when it failed to follow its own established medical screening protocols in treating Hazel Cruz-Vázquez.

As part of their case in chief on both the EMTALA and Puerto Rico law claims, the plaintiffs proposed to introduce testimony from one expert witness, Dr. Carlos E. Ramírez.  The

-2-

plaintiffs disclosed their intention to call Dr. Ramírez at the scheduling conference held by the district court on June 27, 2008. In due course, they provided the defendants with a copy of the expert report prepared by Dr. Ramírez and with a version of his resume that was current through 2004. Dr. Ramírez was deposed by counsel for the defendants in November 2008.

A jury trial began on March 30, 2009. On the fourth day of trial, the plaintiffs called Dr. Ramírez to testify. In response to an oral motion by the defendants, however, the court conducted a Daubert inquiry outside the presence of the jury and ruled that Dr. Ramírez was not a qualified expert and would not be permitted to testify. See Daubert v. Merrell Dow Pharm., 509 U.S. 579 (1993). The court then determined that the plaintiffs lacked evidence to support their claims and granted the defendants' motion for judgment as a matter of law on that basis.

The plaintiffs appeal. As we have addressed the relevant law on the admission of expert testimony at some length in our recent opinion in Pagés-Ramírez v. Ramírez-González, 605 F.3d 109, 113-17 (1st Cir. 2010), we briefly restate our discussion there and offer a few additional points.

## II.

To succeed with a medical malpractice claim, a plaintiff must introduce evidence on causation and the standard of care in the relevant medical circumstances. See id. at 113 (listing

elements of medical malpractice under Puerto Rico law).  Almost invariably, a trier of fact will need expert testimony in order to determine the applicable standard of care and to make a judgment on the cause of the injury.  Id.  Similarly, expert testimony is generally required to assess certain elements of an EMTALA claim.  See, e.g., Ortiz-Lopez v. Sociedad Española de Auxilio Mutuo y Beneficiencia de P.R., 248 F.3d 29, 36-37 (1st Cir. 2001) (finding that "[w]ithout an expert witness through which to enter medical records or provide an opinion in support of their [EMTALA] allegations . . . plaintiffs could not satisfy their burden of proving an EMTALA violation.").  For example, as the district court below noted, without expert testimony, it was impossible to determine "whether or not Plaintiff Cruz was demonstrating the symptoms that require activation of Mennonite[] [General Hospital's] protocol for patients with bleeding during the third trimester of pregnancy," a necessary finding for the plaintiffs' EMTALA claim to succeed.

As we explained in Pagés-Ramírez, the judge's task in determining whether to admit or exclude expert testimony is "to ensure that the expert's testimony 'both rests on a reliable foundation and is relevant to the task at hand.'"  605 F.3d at 113 (quoting United States v. Mooney, 315 F.3d 54, 62 (1st Cir. 2002) (additional quotation marks omitted)).  Although a district court has substantial discretion to make admissibility determinations on

expert testimony, that discretion is not without bounds.  Id. at 112.  An expert "with appropriate credentials and an appropriate foundation for the opinion at issue must be permitted to present testimony as long as the testimony has a 'tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.'" Id. at 115 (quoting Fed. R. Evid. 401).  Generally, if an expert has "scientific, technical, [and] other specialized knowledge" that "will assist the trier better to understand a fact in issue," Gaydar v. Sociedad Instituto Gineco-Quirurgico y Planificacion Familiar, 345 F.3d 15, 24 (1st Cir. 2003) (quotation marks omitted), and that knowledge "rests on a reliable foundation," Mooney, 315 F.3d at 62 (quotation marks omitted), that testimony must be admitted.  Pagés-Ramírez, 605 F.3d at 113-14.

**A. Dr. Ramírez's Medical Credentials**

Dr. Ramírez received his medical degree in 1981 from the University of Puerto Rico, Medical Sciences Campus, and completed an internship in obstetrics and gynecology at the San Juan University Hospital in the Puerto Rico Medical Center in 1982.  As a resident, from 1982 to 1985, he cared for approximately five hundred premature labor patients and thousands of non-premature labor patients.  He became board certified in obstetrics and gynecology in 1987 and was re-certified in 1997.  According to Dr.

Ramírez, he is currently board qualified in those specialties, although his board certification has expired. As a part-time faculty member in the Department of Obstetrics and Gynecology, his duties for a time included serving as an attending physician in charge of the labor room one day a week at the University of Puerto Rico Hospital. Dr. Ramírez served as a faculty member in gynecology and obstetrics for twenty-six years.

In 1985, while Dr. Ramírez was on the faculty at the University of Puerto Rico Hospital, he and a partner established a private practice in general obstetrics and gynecology. After an interlude during which Dr. Ramírez focused in his private practice on pelvic surgery and gynecology while still treating obstetrics patients at the hospital, he returned to focus on obstetrics in 1994. For approximately eight years he treated the full range of obstetrics patients at his practice.

In 2000, after being diagnosed with cancer, Dr. Ramírez left his private practice. For a time he continued to see patients at an oncologic hospital. In 2003, however, his cancer returned and he stopped seeing patients. Since that time, he has served as a consultant to a company owned by his wife that screens doctors seeking to provide care to Medicare patients through a health maintenance program. He has also begun lecturing and doing research on health law, medical malpractice, and EMTALA, among other medicine-related subjects. He has served as an expert

witness in approximately 150 medical malpractice cases in the past ten years. At the Daubert hearing, he explained that his most recent work had been primarily for plaintiffs because defense attorneys had not consulted him on any cases. He explained that defendants are reluctant to hire experts who have testified for plaintiffs in medical malpractice actions.

## B. The Decision to Exclude Dr. Ramírez's Testimony

### 1. The Court's Reasoning

The district court excluded Dr. Ramírez's testimony on the ground that Dr. Ramírez was biased in favor of plaintiffs in medical malpractice cases.[1]  In support of its decision, the court

---

[1] The district court also found that the plaintiffs' failure to provide a copy of Dr. Ramírez's fully up-to-date curriculum vitae was a violation of Rule 37(c)(1) of the Federal Rules of Civil Procedure and provided "a sufficient basis for the Court's decision to exclude Dr. Ramírez's testimony."  This secondary justification for the exclusion of Dr. Ramírez's testimony is unsupportable.  As the district court correctly noted, Rule 37(c)(1) provides that a party who violates the rule may not use undisclosed information at trial "unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1). At oral argument, the defendants conceded that the plaintiffs' production of Dr. Ramírez's 2004 curriculum vitae, rather than his 2008 curriculum vitae, was not prejudicial to them.  They acknowledged that any additional relevant information provided in the updated curriculum vitae, such as Dr. Ramírez's activities since he left medical practice, was known to them.  As the procedural rule itself makes clear, in the absence of harm to a party, a district court may not invoke the severe exclusionary penalty provided for by Rule 37(c)(1).  This is especially so when, as was the case here, the exclusion would result in the dismissal of the plaintiffs' case. See Esposito v. Home Depot U.S.A., Inc., 590 F.3d 72, 79 (1st Cir. 2009) (finding that when a discovery sanction "carrie[s] the force of a dismissal, the justification for it must be comparatively more robust").

described at length the danger of bias that, in the court's view, inhered in Dr. Ramírez's recent work as a medical expert and consultant. The court wrote:

> Dr. Ramírez has not been a practicing obstetrician, or physician in any specialty, during the past seven years. Instead, Dr. Ramírez informed the Court that he has been doing a variety of consulting work, including consulting as an expert witness in approximately 150 cases. Dr. Ramírez testified that during the past year, he has worked exclusively on cases in which he writes reports or gives testimony on behalf of plaintiffs. Dr. Ramírez has not acted as an expert on behalf of a defendant in a single case during the past year. The Court finds that this track record indicates a bias in favor of Plaintiffs.

The court also highlighted the fact that "Dr. Ramírez has begun collaborating with the distinguished attorney for Plaintiffs in this case . . . to give lectures regarding medical-malpractice and EMTALA." The Court noted that those lectures were "for profit, thereby focusing [Dr. Ramírez's] work further on assisting plaintiffs who seek to sue doctors and hospitals for various alleged violations of the law." This too "indicate[d] to the Court that Dr. Ramírez is not an impartial witness" because "he has a significant stake in the successful outcome of cases brought by alleged victims of medical malpractice."

In a similar vein, the Court described its concern that, "[b]y withdrawing from practice and the corresponding supervision of the licensing board, Dr. Ramírez has set the stage for a line of

work in which he need not provide impartial diagnoses of patients." The court concluded that such "lack of control casts serious doubt over the degree to which Dr. Ramírez's testimony would be made in the manner to be expected of a responsible physician who is subject to oversight by a medical licensing board."

Citing a "trend" in which "supposed experts" do not "utiliz[e] scientific methods to render an opinion" but instead "twist[] scientific methods to produce a result that will support the case of those footing the bill," the district court explained that it evaluated such experts "with a highly critical eye in order to preserve the sanctity of the common law legal system." Consistent with that concern, the court concluded that "Dr. Ramírez's testimony is unlikely to be fair and impartial" and would therefore be excluded.

2. The Court's Error

The district court cited as the basis for excluding Dr. Ramírez's testimony aspects of his work that are typically established through cross-examination of an expert witness at trial in an effort to discredit his or her testimony. The court's reasoning had nothing to do with the scientific validity of the opinion that Dr. Ramírez proposed to offer or the principles that underlie it. Yet, the Supreme Court has emphasized that the "overarching subject" of the trial court's inquiry when assessing proposed expert testimony "is the scientific validity -- and thus

the evidentiary relevance and reliability -- of the principles that underlie a proposed submission." Daubert, 509 U.S. at 594-95. By excluding Dr. Ramírez's testimony due to its own determination that Dr. Ramírez would be a biased witness on the grounds cited, the district court abused its discretion.

Assessing the potential bias of an expert witness, as distinguished from his or her specialized training or knowledge or the validity of the scientific underpinning for the expert's opinion, is a task that is "properly left to the jury." United States v. Carbone, 798 F.2d 21, 25 (1st Cir. 1986). While an expert witness is always "subject to being discredited" on cross-examination, the jury must be "free to weigh the credentials of the witness[] and the cogency of the bases given for [his] opinions" if the expert has the requisite basis to testify on an issue of relevance. Sailor Inc. F/V v. City of Rockland, 428 F.3d 348, 354 (1st Cir. 2005). Questions such as "bias, and the weight of the evidence" are "matters for the factfinder." Den Norske Bank AS v. First Nat'l Bank of Boston, 75 F.3d 49, 58 (1st Cir. 1996). Thus, considerations such as an expert witness's pecuniary interest in the outcome of a case, or his status as an expert witness only for one side of an issue, or the extent to which a doctor currently sees patients, go to the probative weight of testimony, not its admissibility. See, e.g., id. (holding that interests of expert witnesses who were employees of plaintiff affected the weight of

their testimony, not its admissibility); Ethicon, Inc. v. U.S. Surgical Corp., 135 F.3d 1456, 1465 (Fed. Cir. 1998). Furthermore, specific credentials, such as an up-to-date board certification, are not required for an expert to be qualified to testify. Pagés-Ramírez, 605 F.3d at 114.

Dr. Ramírez's "specialized knowledge," namely his medical training and experience in the field of obstetrics and gynecology and whether it would "assist the trier better to understand a fact in issue," Gaydar, 345 F.3d at 24 (quotation marks omitted), were the appropriate field of inquiry for the district court when it performed its gatekeeping function and evaluated him as a prospective expert. Instead, the district court deviated from that field of inquiry when it made findings that Dr. Ramírez gave testimony exclusively for plaintiffs during the past year, that he is paid to give lectures on medical malpractice and EMTALA, and that he might testify irresponsibly due to a lack of board certification, and then excluded his testimony on the basis of bias. In so doing, the district court invaded the province of the jury and exceeded its discretion. See Pagés-Ramírez, 605 F.3d at 116 ("[T]he Rules of Evidence require that the judge admit expert testimony relevant to the disposition of the case when it will assist the trier of fact in understanding a fact in issue and rests on a reliable foundation.").

-11-

The judgment is therefore vacated and the case remanded for further proceedings consistent with this opinion.  Costs are awarded to the appellants.

So ordered.