THOMPSON, -Circuit' Judge,
dissenting.
Setting the Stage
Dr. Butler has quite the CV. A graduate of Wellesley College, she has a medical degree from Howard University-and a masters of public health from Columbia University. Specializing in occupational medicine, she is board-certified-in preventive medicine and general public health (by the American Board of Preventive Medicine) and in anatomic pathology, clinical pathology, and hematology (by the American Board of Pathology).[6] . This means (according to the American Board of Preventive Medicine) that she has “core competencies” in, among other things, “epidemiology” and “research into causes of disease and injury in population groups.”[7] She has a pretty impressive job too, working full time as a physician at.a VA medical center that deals with veterans ravaged by diseases after being exposed to toxins during their service. Figuring out the causes of chronic illnesses in patients exposed to toxic substances is what she does day in And day out. All told, she has (in the district judge’s words) over a decade’s-worth of experience “as a practicing diagnostic hematopathologist and as a consultant on occupationally-related malignancies.”
As the Milwards’ specific-causation expert, Dr. Butler testified by report, deposition, and affidavit that — based on her review of the scientific evidence — there is no “safe” level of benzene exposure.[8] In other words, every'benzene exposure increases a person’s risk of leukemia. But, she added, given our different genetic makeups, what might be a safe exposure level for some could be a lethal one for others. Anyway, using two accepted causation methodologies — “relative risk” and “differential diagnosis” — and zeroing in on Brian’s benzene-exposure level (set by Dr. Stewart at 25.6 ppm-years) Dr. Butler concluded that Brian’s “excessive” exposure to benzene caused his leukemia.[9]
. A quick word about how she applied these methodologies
Starting-with relative • risk, Dr. Butler said that even if there were some threshold level of benzene exposure needed to cause leukemia, that threshold was exceeded here — and by a considerable amount. With Brian’s 25.6' ppm-years exposure lev *478 el firmly in mind, she pointed to a peer-reviewed epidemiology study finding that workers exposed to benzene at or above 8 ppm-years were 7 times more likely than controls to develop leukemia. And she did not stop there. Rather, she went on to spotlight other studies of the same caliber showing a statistically significant increased risk of leukemia among workers cumulatively exposed to benzene at levels below Brian’s 25.6 ppm-years.[10] In a deposition she said that she is neither an epidemiologist nor a researcher. She also agreed that some studies found no relationship between benzene exposure and leukemia. Asked by defense counsel if she “intended] in this case to weigh the different epidemiological studies” and comment on “which ones we should rely on and which ones we should discount,” she replied, “No” — and then added:
I’m relying on what I know about the biology, the pathophysiology, what the substance does to the person and the disease process. Now, if there are studies that support it then that’s even better, but without the studies based on what I know there is a very — it’s more likely than not that benzene contributes to the development of [the type of leukemia Brian suffers from].[11]
And she later said that “one doesn’t just rely on literature” in formulating a specific-causation opinion.
Turning, then, to differential diagnosis (aptly described by the majority as “essentially a process of elimination”), Dr. Butler “ruled out” possible causes of Brian’s leukemia, like smoking and obesity, leaving oply benzene. She talked about “‘idiopathic’ leukemia” too — “idiopathic” being another way of saying medical professionals do not know why a given person has the disease. “[E]very case of leukemia has some cause[ ],” she explained, and only “[t]hose cases with unidentified causes” get hit with the “‘idiopathic’” tag. But given her conclusion that Brian’s “benzene exposures were a substantial factor causing his [leukemia],” she could “also ‘rule[ ] out’ that his [leukemia] was ... .‘idiopathic.’ ”
The district judge, however, would have none of Dr. Butler’s talk about benzene being the specific cause of Brian’s leukemia. Given her concession that she is “ ‘not an epidemiologist’ ” and “ ‘not a researcher,’” and given her “professed inability to engage with conflicting epidemiological literature” (these are quotes from the judge’s rescript), the judge excluded her relative-risk analysis as unreliable under Rule 702.[12] That meant that Dr. Butler’s ’ differential-diagnosis analysis— through which she “‘ruled out’ an idiopathic origin of [Brian’s] leukemia by ‘ruling in’ benzene” (these too are quotes from the judge’s order) — was unreliable too (because she is, the judge concluded, not qualified to say whether benzene exposure at Brian’s level could have caused his leukemia). And with the Milwards’ specific- *479 causation expert out of the picture, all that was left for the judge to do was enter summary judgment against them — which the judge did.
Fast-forward to the present, with the majority spying no abused discretion here because Dr. Butler’s “complete unwillingness to engage with the conflicting studies (irrespective of whether she was able to or not) made it impossible for the [judge] to ensure that her opinion was actually based on scientifically reliable evidence” as required by Rule 702. Call me uripersuaded. As I see things, the complaints about Dr. Butler’s specific-causation opinion go to weight, not admissibility — as I now explain.[13]
My Take on the Matter
(a)

The Standard of Review Explained

Abuse-of-discretion review is “respectful,” certainly. Corp. Techs. v. Harnett, 731 F.3d 6, 10 (1st Cir.2013). But “respectful” does not mean we must throw up our hands and simply affirm every discretionary call. See, e.g., Negron-Almeda v. Santiago, 528 F.3d 15, 21 (1st Cir.2008). Review under this standard does involve review, after all. See, e.g., Dopp v. Pritzker, 38 F.3d 1239, 1253 (1st Cir.1994). And we will not hesitate to find abuse where, for example, the district judge based his decision on clearly erroneous facts, made a serious legal error, or suffered a significant’ lapse' of judgment, see, e.g., Cent. Pension Fund of the Int'l Union of Operating Eng’rs & Participating Emp’rs v. Ray Haluch Gravel Co., 745 F.3d 1, 5 (1st Cir.2014); Riva v. Ficco, 615 F.3d 35, 43 (1st Cir.2010); Ruiz-Troche v. Pepsi Cola of P.R. Bottling Co., 161 F.3d 77, 83 (1st Cir.1998) — a point made each time we have reversed the exclusion of expert testimony, see, e.g., Milward, 639 F.3d at 13-14, 23-25; Ruiz-Troche, 161 F.3d at 79, 83-86.
(b)

A Short Primer on Expert Opinion

Rule 702 governs the admission of expert-opinion testimony, with the offering party required to show that such testimony is relevant and reliable. See, e.g., Kumho Tire Co. v. Carmichael, 526 U.S. 137, 149, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999) (relying on Daubert, 509 U.S. at 592, 113 S.Ct. 2786); Ruiz-Troche, 161 F.3d at 80 (same). Expert-opinion testimony is relevant if it will assist the factfinder in understanding and deciding a fact. See; e.g,, Daubert, 509 U.S. at 592, 113 S.Ct. 2786. And it is reliable if it has “a reliable basis in the knowledge and experience of [the pertinent] discipline.”[14] Id.
Basically then, district judges are supposed to weed out nonsense opinions by junk scientists. But in doing so, they must keep a bunch of things in mind — including the following:
• The rule on expert-opinion testimony is notably “liberal,” with the evidence considered presumptively admissible. See 4 Jack B. Weinstein & Margaret A, Berger, Weinstein’s Federal Evidenced 702.02[1], at 702-5 (Joseph M. *480 McLaughlin ed., 2d ed. 2013) (“Wein-stein’s, ” to’ save some keystrokes).
• Proponents of expert testimony must show that the proposed witness is able — through her education, training, or experience — to offer a meaningful opinion on the issue in play. Id; § 702.04[l][c], at 702-57.
• An expert can rely, then, on “clinical instinct” — i.e., “what experience adds to scientific knowledge and training”— which is a well-known and accepted part of today’s medical practice. Mueller v. Auker, 700 F.3d 1180, 1191 (9th Cir.2012) (quoted approvingly in Weinstein’s § 702.05[2][c], at 702-103 n. 46).
• Judges abuse their discretion if they “exclude testimony that would otherwise” help the factfinder “understand a fact in issue, simply because the expert does not have the specialization” that the judges think “most appropriate.” Pagés-Ramírez v. Ramírez-González, 605 F.3d 109, 114 (1st Cir.2010) (internal quotation marks omitted); see also Ralston v. Smith & Nephew Richards, Inc., 275 F.3d 965, 970 (10th Cir.2001) (explaining that so long as the expert keeps “within the reasonable confines of [her] subject area, ... a lack of specialization does not affect the admissibility of [her] opinion, but only its weight” (internal quotation marks omitted)).
• Also, an expert need'not have epidemiological studies at the ready to get her opinion in. See Milward, 639 F.3d at 24 (holding that “[e]pidemiological studies are riot per se required as a condition of admissibility regardless of context”); see also Daubert, 509 U.S. at 593, 113 S.Ct. 2786 (explaining that “[p]ublieation ... is not a sine qua non of admissibility”).
• And ‘an opinion, by the way, does riot have to conclusively prove causation to be admissible. “[M]edical knowledge,” we can all agree, “is often uncertain. The human body is complex, etiology is often uncertain, and ethical concerns often prevent double-blind studies calculated to establish statistical proof.” United States v. Sandoval-Mendoza, 472 F.3d 645, 655 (9th Cir.2006). But that “does not. preclude the introduction of medical expert opinion testimony when medical knowledge permits the assertion of a reasonable opinion,” Id. (internal quotation marks omitted).
• Critically too, deciding “which of several competing scientific theories has the best provenance” is none of the judges’ business — which is just another way of saying that judges must focus on the expert opinion’s admissibility, not its correctness. Ruiz-Troche, 161 F.3d at 85.
•.Here’s a biggie: That the parties’ experts disagree (they often do, unsurprisingly) goes to weight, not admissibility. See, e.g., Feliciano-Hill v. Principi, 439 F.3d 18, 25 (1st Cir.2006); see also Weinstein’s § 702.05[3], at. 702-112 n. 58 (collecting a cornucopia of additional cases).
• Here’s another biggie: An expert’s backers “do not necessarily have the burden” of disproving a study championed by the other side — that is what a .case the majority relies on says. See Kuhn, 686 F.3d at 626. Again, the proponents must “show that [their expert] arriyed at [her] contrary opinion in, a scientifically, sound and methodological fashion.” Id. And if they do, “the question becomes one for the jury to decide.” Id.
<c)

The Instances of Abused Discretion

The ruling my colleagues affirm — that Dr. Butler “is ‘not' an epidemiologist’ and *481 ‘not a researcher’ ” who “professed” an “inability to engage with conflicting epidemiological literature” and “thus” is “unqualified” to say whether Brian’s level of benzene exposure could cause his leukemia (quotes lifted from the district judge’s order) — is filled with errors. And these errors rise to the level of an abuse of discretion.
Take the district judge’s fixation on her saying that she was “not an epidemiologist” and “not a researcher.” Time and again we have said that one “need not be a specialist in a particular medical discipline to render expert testimony relating to that discipline.” Gaydar v. Sociedad Instituto Gineco-Quirurgico y Planificacion Familiar, 345 F.3d 15, 24 (1st Cir.2003); see also Pagés-Ramírez, 605 F.3d at 116-17. And not only have we talked the talk, but we have walked the walk — reversing as an abuse of discretion expert-exclusion rulings premised - on an expert’s missing the type of specialization the judges think necessary, even though the testimony would have helped the jury understand a disputed issue. See, e.g., Pagés-Ramírez, 605 F.3d at 116-17. And given her training and experience — don’t forget, (a) her board certification in preventive medicine shows she has competency in epidemiology and research into causes of disease, and (b) she analyzes specific-causation • issues as a routine part of her job — the judge’s ruling faulting Dr. Butler for not being able to “evaluate the relevant studies” with the “rigor” of an epidemiologist fits that category of error. The majority tries to downplay the district judge’s comments about her not being an epidemiologist by playing up how concerned he was with her “unwilling[ness]” to analyze the “conflicting” literature. But the fact remains that the judge did add her non-epidemiologist status to his decisional niix, which (for the reasons just discussed) is an abuse of discretion, plain and simple.
Now, as for the judge’s belief — shared by the majority — that Dr. Butler “professed [an] inability to engage with the conflicting epidemiological literature,” there are problems galore. '
For starters, I espy no conflict. To repeat a point I made a few paragraphs ago: The studies Dr. Butler relied on show that benzene-exposure -levels, .-below the 25.6 ppm-years endured by Brian can cause leukemia.--. The Rinsky study — the supposedly “conflicting” study — also shows that benzene exposure at certain levels can cause leukemia, though the authors found no increased risk of leukemia among workers exposed to less than 40 ppm-years of benzene. According to the district judge, because the Rinsky study did not find any increased risk of leukemia at lower exposure levels, there is a “conflict” and “debate within the epidemiological literature” that can only be put to rest-by someone with epidemiologist credentials. Not only did the judge get the-.epidemiologist-credentials part wrong (as I just noted); he got the “conflict” part wrong too. For a true conflict to exist, the Rinsky study would have to show that benzene-exposure levels of 25.6 ppm-years or lower cannot cause leukemia. And the Rinsky study does no such thing.
Anyhow, even assuming there is a conflict, the judge still erred in two important ways. For one thing,, despite -what the judge said, Dr. Butler hardly copped to being unable to engage with the literature. By my .lights, the judge could only say what he said by misreading her, deposition. Questioned (recall) by defense counsel about whether she “intended in this case to weigh the different epidemiological studies and offer an opinion as to which- ones we should rely on and which ones we should discount,” Dr. Butler, said, “No.” That is because, she stressed, (a) one need not *482 rely just “on literature” and (b) her experience with “biology,” “pathophysiology,” and “the disease process” provided the specialized knowledge to support her specific-causation testimony. Statements (a) and (b) square with our caselaw. See, e.cj., Milward, 639 F.3d at 24 (emphasizing how “[e]pidemiological studies are not per se required as a condition of admissibility”). And just as importantly, nothing she said there intimated even a possible whisper of a hint of a suggestion that she could not take on the relevant literature. Put differently, she did not say that she lacks the know-how to assess Rust-Oleum’s preferred studies — only that she did not need to in formulating her expert opinion. The word “intend” — I hope we can all agree— does not imply “can’t.”
For another thing, despite what the judge indicated, neither Dr. Butler nor the Milwards had any burden to explain why the Rinsky study is wrong. Think back to the primer: The proponents of expert testimony, I noted, are not reflexively obliged to “discredit” a study pushed by their opponents. Kuhn — a case highlighted by the majority — says as much. Sure, the plaintiffs’ expert there tried to poke holes in a study relied on by the defendants. And, deeminjg the criticisms insubstantial, the judge excluded the expert from testifying. Significantly for present purposes, though, the circuit court wrote that the expert did not have to debunk the study; he only had to show that he reached his conclusion via a sound methodology.[15] See Kuhn, 686 F.3d at 626. Dr. Butler did that in spades, using two recognized techniques for identifying causes (relative risk and differential diagnosis) and relying in part on studies that (as best I can tell) neither the district judge nor the majority has any problems with. And having met her burden, a jury should get to decide which studies to believe (hers or Rust-Oleum’s), if any, see id. — just like a jury would get to do if faced with dueling experts (instead of dueling studies), see Feliciano-Hill, 439 F.3d at 25.
Summing Up
Because, as discussed, the judge made serious judgment errors in excluding Dr. Butler’s expert testimony — a ruling (in my view) inconsistent with the “liberal thrust of the Federal Rules and their general approach of relaxing the traditional barriers to ‘opinion’ testimony,” see Daubert, 509 U.S. at 588, 113 S.Ct. 2786 — 1 would reverse his ruling as an abuse of discretion. And because the majority, though conscientious, has decided otherwise, I respectfully — but unequivocally — dissent.

. Pathology is a medical specialty focusing on the nature and causes of diseases.' See Steel-man's Medical Dictionary 1332 '(27th ed. 2000) (“Stedman’s,” from here on). And hematology is the study of blood-related diseases. See id. at 796.

. Epidemiology is the study of the incidence, distribution, and control of disease in a population. See id. at 604.

. Remember — the Milwards had to show that benzene exposure can cause leukemia (general causation) and that Brian’s exposure , was a substantial factor contributing to his leukemia (specific causation). A different district judge excluded the Milwards’ general-causation expert as unreliable under Rule 702. Noting (among other things) that the judge had taken “sides on questions that are currently the focus of extensive scientific research and debate — and on which reasonable scientists can clearly disagree” — we concluded that the exclusion edict constituted an abuse of discretion. See Milward, 639 F.3d at 22, 26.
On a different note, because there are two Milwards — Brian and Linda — it makes sense to use a first name where necessary to avoid confusion. Obviously I intend no disrespect.

.As my friends in the majority note, the Mil-wards hired Dr. Stewart (an industrial hygienist) to assess Brian’s benzene exposures.

.See Deborah R. Glass et al., The Health Watch Case — Control Study of Leukemia and Benzene: The Story So Far, 1076 Ann. N.Y, Acad. Sci. 80 (2006); Dusica Lazarov et al., Acute Myeloid Leukemia and Exposure to Organic Solvents: A Case-Control Study, 16 Eur. J, of Epidemiology 295 (2000); Richard B. Hayes et al., Benzene and the Dose-Related Incidence of Hematologic Neoplasms in China, 89 J. of the Nat’l Cancer Inst. 106.5 (1997).

. Pathophysiology is the study of the functional changes that accompany a particular disease. See Stedman's 1333.

. The "conflicting” study that everyone focuses on is Robert A, Rinsky et al., Benzene and Leukemia: An Epidemiologic Risk Assessment, 316 New Eng. J. of Med. 1044 (1987), which found no increased risk of'leukemia in workers exposed to less than 40 ppm-years of benzene.

. Because the majority jettisons the case by upholding the judge's decision to exclude Dr. Butler’s testimony, I (obviously) focus my energy on that issue. So, like the majority, I make no comment on Rust-Oleum’s other arguments — i.e., that the judge should have excluded Dr. Stewart’s testimony and that the Milwards cannot show that the failure to provide certain warnings about benzene proximately caused Brian's injuries.

. Because everyone focuses on whether Dr. Butler’s testimony is reliable, I will do likewise.

. So instead of supporting the majority’s position that Dr. Butler had to explain why she disagreed with "incompatible” studies, Kuhn rejects that position. And Norris — another case cited by the majority — is not a difference maker for the majority either. The court there upheld the exclusion of expert testimony because the experts did not confront the reality that their opinions were "flatly contrary to all of the available epidemiological evidence,” see 397 F.3d at 885-86 — which is worlds apart from our case.